**Robert T. LOVELL, et al., Plaintiffs, Appellants,**

v.

**Joseph BRENNAN, et al., Defendants, Appellees.**

No. 83–1572.

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1984.

Decided Feb. 29, 1984.

Alvin J. Bronstein, Washington, D.C. and Martha E. Geores, Lewiston, Me., with whom Bell & Geores, Lewiston, Me., was on brief, for plaintiffs, appellants.

William H. Laubenstein, III, Asst. Atty. Gen., Augusta, Me., with whom James E. Tierney, Atty. Gen., and Gail Ogilvie, Asst. Atty. Gen., Augusta, Me., were on brief, for defendants, appellees.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

These consolidated class actions were brought under 42 U.S.C. § 1983 by inmates at Maine State Prison (Thomaston), Maine's only maximum security correctional facility for men, against the Governor of the State of Maine and various state corrections officials. Plaintiffs in Civil Case No. 78–90P, comprising all inmates who had been or might be confined in administrative segregation, alleged that the procedure for assigning them to that status violated the fourteenth amendment due process clause and a consent decree entered in a previous suit, and that various conditions of their confinement violated their rights under the sixth, eighth and fourteenth amendments. Plaintiffs in Civil Case No. 79–8P, comprising all inmates who had been or might be

confined in protective custody, alleged that the procedure for granting them that status violated due process; their other claims paralleled those of the administrative segregation plaintiffs. Plaintiffs in Civil Case No. 79–76P, comprising all inmates who had been or might be confined in the general population of the prison, alleged that the conditions of their confinement violated the eighth and fourteenth amendments. All three classes of plaintiffs also challenged the use of so-called "restraint cells" on eighth and fourteenth amendment grounds, and filed pendent state law claims.

The complaints were filed in the United States District Court for the District of Maine between May, 1978, and March, 1979. In the fall of 1979 and early 1980, the district court held evidentiary hearings in Cases Nos. 78–90P (administrative segregation) and 79–8P (protective custody), and twice toured the prison. Defendants instituted a lockdown in April, 1980. This was followed by the appointment of a new warden and the implementation of substantial improvements in the prison's physical plant, staffing, and programs. The record in the cases was reopened, and the parties engaged in extensive discovery between April, 1980, and February, 1981. The district court held further evidentiary hearings in March, June, and July of 1981 regarding all three classes of inmates. After briefing and oral argument, the court toured the prison once again in November, 1982.

The district court issued findings of fact and conclusions of law in a published opinion. *Lovell v. Brennan,* 566 F.Supp. 672 (D.Me.1983). By agreement of the parties, the fact findings were based on the testimony and exhibits received at the 1981 hearings, a post-trial stipulation of facts, and the court's November, 1982, view of the prison. The court concluded that the procedure for assigning inmates to administrative segregation violated the terms of the consent decree, and that the use of "restraint cells" violated the eighth and fourteenth amendments: it issued an order enjoining future violations. The court also held that the other assignment procedures and conditions of confinement did not cur-

rently violate the Constitution or the consent decree, and dismissed all of the remaining claims, including the pendent state law claims. The general population and protective custody plaintiffs appeal.

We are asked to hold that the district court erred in two specific respects: first, the general population inmates argue that the district court should have issued an injunction to prevent their living and working conditions from deteriorating to the low level observed by the court before the 1980 lockdown, and to ameliorate the allegedly excessive current level of violence in the general population; second, the protective custody inmates argue that the criteria promulgated in November, 1980, for establishing protective custody status in individual cases are unduly restrictive and pose an unreasonable risk of harm to inmates who seek that status.

The general population inmates' argument runs essentially as follows: the district court's finding that current prison conditions, though substantially improved since the beginning of the suit, are still only minimally adequate under eighth amendment standards, implies that there were constitutional violations in the past. The fact that defendants made efforts to improve conditions under pressure of litigation, it is argued, provides no guarantee that they will not let conditions deteriorate to unconstitutional levels in the future. The inmates conclude that an injunction is necessary to prevent future constitutional violations.

██ It is true that the purpose of injunctive relief is to prevent future violations, and that a showing of past violations is not necessarily required. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587 (1928). "All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Medical Society,* 343

U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). Furthermore, voluntary cessation of allegedly illegal conduct does not deprive a court of jurisdiction. "Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); *see also United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). Still, the determination whether circumstances warrant injunctive relief lies in the discretion of the trial court, *W.T. Grant,* 345 U.S. at 635–36, 73 S.Ct. at 898–99, and the burden of persuasion lies with the moving party, *id.* at 633, 73 S.Ct. at 897. Therefore, while not necessary as a matter of law, a showing of past violations may be crucial in practice to a suit for injunctive relief.

■ In the present case, the district court found that current living conditions at the prison were not unconstitutional. It did not reach the question of past conditions, having limited the basis for its fact findings to the 1981 evidentiary hearings and the 1982 stipulations and prison tour.

> The conditions of confinement at MSP are unpleasant, if not harsh. Prior to the April 1980 lockdown, living conditions at the prison may well have been below minimum standards. Nevertheless, the evidence in this case does not support the conclusion that the current living and working conditions at MSP fail to meet the requirements of the Eighth Amendment.
>
> . . . .
>
> MSP is an antiquated facility which is hardly a credit to the State of Maine. Nevertheless, the basic human needs of the inmates—reasonably adequate shelter, sanitation, food, clothing, personal safety, and medical care—are being met.

566 F.Supp. at 687 & 689 (footnote omitted). The court's action in excluding evidence of pre-lockdown conditions was entirely proper in light of the changes instituted after the lockdown. *See Oregon State Medical Society,* 343 U.S. at 332–33, 72 S.Ct. at 695. Its findings relating to current prison conditions must be upheld unless they are clearly erroneous. Fed.R.Civ.P. 52(a). Here the district court took the opportunity to view at first hand the kind of shelter, sanitation and lighting afforded the general population inmates. The plaintiffs themselves agreed that the "food service, clothing, medical care, mental health services and visitation opportunities" were adequate. 566 F.Supp. at 688. The court also noted that preventive maintenance and cleaning programs were in operation, with daily inspections and written reports, that no significant sanitation deficiencies or plumbing code violations were found, that lighting and ventilation improvements were in progress, that fire hazards were greatly reduced, and that working conditions in the prison shop met OSHA standards. These findings, as well as the conclusion that current conditions were not unconstitutional, are amply supported by the record, and we accept them.

■ Plaintiffs nevertheless argue that the district court abused its discretion in denying injunctive relief. We disagree. In looking at current conditions at the prison, the district court took into account the improvements made since the April 1980 lockdown and those that were being implemented or projected at the time of trial.

> [C]onditions at MSP as disclosed by the evidence received at the 1981 hearings and the Court's observations during its November 1982 tour of the prison differ markedly from those which were revealed by the evidence at the 1979–80 hearings and observed by the Court when it viewed the prison at that time. There is no question that substantial improvements have been made. Although the Court is satisfied that defendants have endeavored in good faith to ameliorate the conditions in which inmates are confined at MSP, it is clear that this litigation in large measure has sparked the improvements made.

566 F.Supp. at 677. At the same time the court plainly recognized that the defendants' efforts left something to be desired.

> In rejecting the Eighth Amendment claims of the general population inmates, the Court in no way lauds or even approves of the conditions at MSP. As noted above, defendants have improved the conditions at the prison only under the very real threat of this lawsuit and only to the minimum extent mandated by the Eighth Amendment. The Court is troubled that defendants have failed to make a number of significant improvements at the prison which could be accomplished at minimal cost.

*Id.* at 689. In these circumstances, the court could have retained jurisdiction of the case to monitor conditions at the prison if it found a likelihood that the constitutional rights of the plaintiffs would be violated in the near future. *Campbell v. McGruder,* 580 F.2d 521, 543 (D.C.Cir.1978). Such a procedure would have "relieve[d] plaintiffs of the considerable burden and delay of initiating new proceedings" in the event of future violations. *Id.* at 544. On the other hand, dismissal was proper if the lower court found no present violations and thought that there was no likelihood of violations in the near future. *Id.* at 543. Plaintiffs have cited no case in which a district court's discretionary determination whether to exercise continuing jurisdiction was reversed in the absence of a proven constitutional violation;[1] indeed, authority appears to require the contrary, unless fact findings are erroneous or discretion has been abused. *See Battle v. Anderson,* 708 F.2d 1523, 1539–40 (10th Cir.1983), *cert. dismissed sub nom. Meachum v. Battle,* —— U.S. ——, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984) (mem.). Evidence concerning the good faith of the defendants and the effectiveness of their improvements at the prison, *see W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897, by no means supported the plain-

tiffs' contentions unequivocally. We think that the district court was entitled to presume that the state prison authorities would carry on their duties in compliance with the Constitution without further monitoring by the federal courts. *See Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (absent constitutional violations, federal courts should be reluctant to interfere with state prison administration); *Taylor v. Sterrett,* 600 F.2d 1135, 1141 (5th Cir.1979) (absent constitutional violations, court should not retain jurisdiction once object of original suit is accomplished). Of course, if the district court's prediction turns out to be incorrect and prison conditions fall below constitutional standards in the future, the plaintiffs may bring a new suit. *W.T. Grant,* 345 U.S. at 636, 73 S.Ct. at 899.

■ The general population plaintiffs also complained that the level of violence was excessive, and that defendants failed to exercise reasonable care to protect the inmates. The district court, relying on *Withers v. Levine,* 615 F.2d 158, 161–62 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980), recognized that prison inmates have a constitutional right under the eighth and fourteenth amendments "to be reasonably free from violence and the threat of violence while incarcerated," 566 F.Supp. at 686, and that prison officials have a corresponding obligation under 42 U.S.C. § 1983 to exercise reasonable care to provide reasonable protection from an unreasonable risk of harm. *Id.* We think the district court accurately stated the law. Applying this standard, the district court found that, although the inmates may well have been denied adequate protection from violence before the April 1980 lockdown, "the record does not support plaintiffs' claim that violence among the general population inmates since the lockdown has continued to be 'excessive and unreasonable.'" *Id.* The three specific in-

---

1. We note that in *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194 (8th Cir.1974), *on remand, Finney v. Hutto,* 410 F.Supp. 251 (E.D. Ark.1976), *aff'd,* 548 F.2d 740 (8th Cir.1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the court of appeals remanded to the district court with instructions to retain jurisdiction. 505 F.2d at 214–15. This disposition, however, was based on findings of past and continuing constitutional violations. *Id.*

cidents of violence alleged to have occurred since the lockdown were found to be isolated instances which did not rise to the level of pervasive violence found unconstitutional in other state prisons. The court also found that the security staff had recently been increased and the inmate classification system improved; it concluded that plaintiffs failed to show that staffing or training was inadequate or that the classification system was constitutionally flawed. *Id.* at 687. We find no error in either the court's findings or its conclusion that inmates were "reasonably safe" at the prison. Injunctive relief was therefore properly denied.

We now consider the protective custody plaintiffs' claim that the criteria for granting protective custody status are unduly restrictive and pose an unreasonable risk of harm to inmates who seek that status. The district court found that prior to November, 1980, protective custody was available to inmates upon request, and that the protective custody population ranged from thirty-five to sixty-three. In an effort to prevent abuse of the system and ensure that protective custody status be reserved for those genuinely in need of protection, the then warden of the prison promulgated new criteria for maintaining protective custody status in November, 1980. Under the new criteria, documentation of one of the following elements was required: a record of assaults; reputation among population, attested to in writing by staff, as informant or trial witness; verified threats, verbal abuse, or harassment; conviction of a crime repugnant to the inmate population; former police or criminal justice activity resulting in verified threats, abuse or harassment; reliable, confirmed evidence of sexual harassment. The new criteria applied to inmates seeking to maintain protective custody status, but not to those requesting emergency placement. The number of inmates in protective custody was twenty-four in June, 1981, and twenty-eight in June, 1982.

Plaintiffs contend that the elimination of automatic protective custody on request resulted in an unreasonable risk of violence for inmates whose requests for protective custody status were denied. They cite the testimony of three inmates, involuntarily returned to the general population from protective custody, that they were assaulted by other inmates. The district court noted that the testimony was disputed by defendants, and found the evidence "unclear as to the circumstances surrounding the incidents in question." 566 F.Supp. at 690. The court also found that protective custody creates special administrative and fiscal burdens, *e.g.,* separate housing and escort services, which are relevant factors in assessing the reasonableness of the protection provided. *See Nadeau v. Helgemoe,* 561 F.2d 411, 417 (1st Cir.1977). Finally, the court observed in passing that expert opinion is not unanimous on the question of voluntary placement in protective custody: this presumably reflects the risk of infiltration of the protective custody population by inmates not in need of protection themselves or intent on attacking other inmates. In light of these findings, as well as those concerning the level of violence among the general population, we think the district court properly concluded that plaintiffs failed to show "that the revised criteria for Protective Custody status . . . unreasonably expose[] them to violence or the threat of violence." 566 F.Supp. at 691.

The dismissals of the remaining claims of both plaintiff classes were neither briefed nor argued, and we therefore do not review them.

*The judgment is affirmed.*