Robert DeMALLORY, et al.,
Plaintiffs–Appellants,

v.

Timothy CULLEN, et al.,*
Defendants–Appellees.

Nos. 87–1492, 87–1493.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1988.
Decided Aug. 23, 1988.

* Mr. Cullen is the current Secretary of Wisconsin's Department of Health and Social Services. We therefore substitute Mr. Cullen as the named defendant-appellee pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Gary L. Starkman, Marc C. Smith, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiffs-appellants.

John J. Glinski, Asst. Atty. Gen., State of Wis., Dept. of Justice, Madison, Wis., for defendants-appellees.

Before BAUER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

Plaintiff, Robert DeMallory, is an inmate at Wisconsin's Waupun Correctional Institute (WCI). On August 17, 1978, WCI authorities placed DeMallory in the WCI Adjustment Center, a maximum security facility within the prison that separates certain inmates from general population inmates, because of his alleged involvement in a disturbance at WCI. The Adjustment Center's surroundings are spartan, and its prisoners' activities are more restricted than those of general population inmates. On November 4, 1978, prison authorities released DeMallory from the Adjustment Center, but returned him on January 10, 1979, where he remained until February, 1988.

DeMallory originally brought two suits. In the first, DeMallory alleged that conditions of confinement in the WCI Adjustment Center amounted to cruel and unusual punishment. In the second, he argued that limitations on the legal resources available to Adjustment Center prisoners unconstitutionally restrict their access to the courts, thus violating their Fourteenth Amendment rights. Defendants, various government and prison officials, moved for summary judgment on both the conditions-of-confinement claim and the access-to-courts claim. DeMallory moved for summary judgment on the access-to-courts claim. After submitting the matter to a magistrate, the district court granted summary judgment on both of DeMallory's claims in favor of defendants. DeMallory appeals.

## I.

DeMallory first argues that conditions in the Adjustment Center constitute cruel and unusual punishment. His Eighth Amendment claim focuses primarily on the defendants' allegedly willful failure to protect him from the activities of other Adjustment Center inmates and the unsanitary conditions in the unit. He alleges that WCI officials knowingly housed mentally-ill inmates with the rest of the Adjustment Center population, that these inmates soil their cells and surrounding areas by throwing food, human waste, and other debris, and that these inmates have set "approximately 50 fires," that have resulted in the hospitalization of several inmates, including himself. He further alleges that the various defendants are personally responsible for the health and safety hazards, specifically, that WCI officials intentionally allowed the Adjustment Center to remain unsanitary and kept Adjustment Center windows locked despite repeated fires. Finally, DeMallory contends that a guard spit on him while he was housed in the Adjustment Center.

The district court granted summary judgment in favor of the defendants, holding that "there has been no competent evidence presented that the prison officials evidenced a deliberate indifference to DeMallory's medical needs, due to the inhalation of smoke, for a finding that his Eighth Amendment rights were violated." As for the spitting incident, the court ruled that "a correctional officer spitting upon a prisoner does not rise to the level of a constitutional violation." *Id.* at 3. We agree with the district court's disposition of those portions of DeMallory's Eighth Amendment claim that address the medical care given DeMallory and the spitting incident.

Because the district court failed to address the primary thrust of DeMallory's complaint—that WCI officials have willfully allowed unsanitary and dangerous conditions to continue in the Adjustment Center, however, we reverse the order granting summary judgment and remand for further proceedings. "It has long been established that prisoners have rights under the Eighth Amendment to receive reasonable protection from harm inflicted by other inmates." *Madyun v. Thompson*, 657 F.2d 868, 875 (7th Cir.1981). Such a claim may be sustained only by a showing of deliberate indifference by prison officials; mere negligence is not enough. *Duckworth v. Franzen*, 780 F.2d 645, 652–55 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). Liability under the Eighth Amendment "requires, at a minimum, that the prison officials have realized there was imminent danger and have refused—consciously refused, knowingly refused—to do anything about it." *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir.1987).

The district court, without expressly saying so, apparently treated the defendants' motion for summary judgment on DeMallory's Eighth Amendment claim as a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Only the plaintiff's complaint and the defendants' answers were before the court; no discovery was taken. In their answer to the complaint, the defendants asserted that they had insufficient information from which they could form an opinion with respect to the allegations and denied any unconstitutional conduct. By awarding summary judgment in this situation, the district court actually dismissed the case on the pleadings. In so doing, the district court failed to follow the basic standard governing Rule 12(b)(6) dismissals.

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Moreover, in "complex cases involving both fundamental rights and important questions of public policy, such peremptory treatment is rarely appropriate." *Rutan v. Republican Party of Illinois*, 848 F.2d 1396, 1414 (7th Cir., 1988) (Ripple, J., concurring in part, dissenting in part). In this case, the district court did not read DeMallory's Eighth Amendment claim in this light. Rather, by focusing on only two incidents alleged in the complaint, the court failed to consider the complaint as a whole and seemingly ignored the more pressing issues alleged by DeMallory.

DeMallory's conditions-of-confinement complaint, taken as true, as it must for purposes of a motion to dismiss, states a claim on which relief can be granted. The Supreme Court has emphasized that "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citation omitted). *See also Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982), *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed. 2d 1304 (1983). In all cases, the determination as to whether prison conditions constitute cruel and unusual punishment turns on the totality of the conditions of confinement. *Madyun*, 657 F.2d at 874; *see also Smith*, 690 F.2d at 125 (quoting *Madyun*). Not surprisingly, suits challenging the sanitation and safety of prisons have received varying treatment by federal courts. This court has repeatedly stressed that the Eighth Amendment requires prison officials to maintain minimal sanitary and safe prison conditions and we have not hesitated to award damages to inmates when prison conditions have fallen below the threshold of decency ensured by the Eighth Amendment. *See, e.g., Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir.1988) (Eighth Amendment requires at least five hours of exercise and one shower each week for inmates segregated more than ninety days); *Wells v. Franzen*, 777 F.2d 1258 (7th Cir.1985) (Eighth Amendment requires minimal exercise, showers, clothing, and

sanitary eating conditions). We therefore reverse the judgment of the district court and remand the case for further consideration.

## II.

DeMallory next argues that restrictions on library access for prisoners in the Adjustment Center preclude their effective access to the courts. Prisoners in the Adjustment Center may not go to the prison library, may not confer personally with WCI's inmate paralegals, and may not participate in the legal training and services offered through the WCI paralegal program. The Adjustment Center prisoners may check out books from the legal library by written request and may consult paralegals by correspondence. They also may confer with each other during exercise periods and seek some legal assistance through public defenders, court-appointed counsel, private attorneys, or Wisconsin's Legal Assistance to Institutionalized Persons (LAIP) Program. A set of 1969 Wisconsin statutes is also available to the inmates housed in the Adjustment Center. The record includes several memoranda in which WCI officials acknowledge that they are "aware of the problem of legal assistance for those inmates in segregation status," but no solution appears forthcoming.

A prison inmate's right of access to the courts is the most fundamental right he or she holds. "All other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden." *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973). In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that the constitutional right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.,* at 828, 97 S.Ct. at 1498. Prison authorities need not provide both of these, but must provide one or the other, or a comparable alternative. *Id.* at 830–32, 97 S.Ct. at 1499–1500. Prison

officials bear an affirmative duty to provide inmates with this reasonable access to courts and counsel and also bear the burden of proving the adequacy of the means they provide. *Campbell v. Miller,* 787 F.2d 217, 225–26 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). The defendants, therefore, can prevail if they can demonstrate that DeMallory had access to an adequate library or to adequate personal legal assistance.

The magistrate found that although the legal assistance available to the Adjustment Center's prisoners might not be "optimal," it constituted "sufficient access to the courts according to *Bounds.*" The district court agreed. We disagree. The district court lacked the evidentiary basis necessary for granting the defendants' summary judgment. DeMallory contends that the procedures available to inmates at the Adjustment Center fail both elements of this test. He argues first that the law library available to Adjustment Center inmates is inadequate. As noted, prison authorities denied DeMallory all access to the library with the exception of 1969 Wisconsin Statutes housed in the Adjustment Center and specific volumes requested by inmates. In *Corgain v. Miller,* 708 F.2d 1241 (7th Cir.1983), this court held a system functionally similar to WCI's constitutionally inadequate. In *Corgain,* inmates challenged the adequacy of their access to state courts while they were incarcerated at the United States Penitentiary at Marion, Illinois. The Marion law library was deficient in state law materials, but the inmates could obtain copies of necessary materials by written request accompanied by precise citations. We agreed with a federal magistrate's conclusion that Marion's system was constitutionally insufficient.

The magistrate correctly concluded that the law library system at USP–Marion, without state law materials or supplemental legal aid, was inadequate. He aptly characterized the Shawnee Library System's requirement for precise citations for photocopying as a "Catch 22" because the inmate could obtain precise

citations only if he could refer to state law materials.

*Id.* at 1250. We then approved plans submitted by prison officials to remedy the inadequate access by providing inmates either with starter libraries, in which the inmates themselves could do preliminary research, or with lists of legal services offices with whom the state had contracted to provide assistance to inmates. *See id.* at 1248–51.

We again addressed the access-to-courts issue in *Caldwell v. Miller*, 790 F.2d 589 (7th Cir.1986). In *Caldwell*, prisoners at Marion challenged restrictions placed on library access following a "lockdown" imposed after the death of an inmate and two guards. During the lockdown, prisoners were denied access to the main library, but were allowed to initiate legal research in smaller "basic libraries" and to request copies of further materials by written requests including exact page citations. The district court granted summary judgment in favor of the defendant warden. We reversed, holding that factual issues remained regarding the sufficiency of the materials available in the basic libraries. The court noted that if "the exact-cite system is supplemented by adequate reference materials in the basic library," then the exact-cite system may be permissible. *Id.* at 607. Thus, the mere existence of basic libraries did not preclude the inmates from raising a factual issue regarding the sufficiency of their access to the courts. *Id.* at 607. In the *Campbell* case, however, we

upheld the sufficiency of the "exact-cite" system for inmates in a segregated control unit based upon the evidentiary record before the district court. We found this system adequate in that case because the control unit library "is designed to facilitate the initial steps of legal research, *viz.*, the formulation of tentative theories and the notation of materials needed to be consulted," *Campbell*, 787 F.2d at 227, and because the "exact-cite" system did not engender any delays. *Id.* at 229.[1]

■ DeMallory, however, had *no* access to law libraries—even "starter" or "basic" libraries. Unlike the control unit in *Campbell*, the Adjustment Center library lacked the primary resources to allow DeMallory or other inmates to adequately begin their initial legal research or to formulate tentative theories.[2] Moreover, because the district court was unable to appoint an attorney to represent him, DeMallory had to proceed without counsel. DeMallory's meaningful access to the courts, therefore, rested solely on written correspondence with inmate paralegals for assistance on his Eighth Amendment claim. Dependence on untrained inmate paralegals as an alternative to library access does not provide constitutionally sufficient access to the courts. "Rather, when inmates have no access to a law library they must be provided with assistance by trained, skilled, and independent legal personnel." *Walters v. Thompson*, 615 F.Supp. 330, 340 (N.D.Ill. 1985).[3]

1. *Corgain, Campbell,* and *Caldwell* addressed challenges mounted by prisoners at the United States Penitentiary at Marion, Illinois, and *Campbell* addressed court access by prisoners in Marion's Control Unit. "Marion is the highest level maximum security prison in the federal penitentiary system. The Control Unit is designated for those inmates deemed unfit for the general population at Marion because they pose a threat to others or to the orderly operation of the institution." *Campbell*, 787 F.2d at 220. Thus, "Marion presents unique disciplinary and security considerations. This is true whether one is dealing with general population inmates or with those in the Control Unit." *Caldwell*, 790 F.2d at 606. By contrast, although WCI is a maximum security facility, its security concerns are generally less severe than those present at Marion. Therefore, WCI's legitimate security

needs, without more, do not justify restrictions more severe than those tested in *Corgain, Caldwell,* and *Campbell.*

2. The record also is unclear as to whether the "volume-cite" system in place at the Adjustment Center caused unreasonable delays in filing court documents.

3. Other courts facing this issue also have taken the position that, at a minimum, inmates either must be given direct access to adequate libraries or must receive help from trained and competent legal personnel other than mere "writ writers" or inmate paralegals. *See, e.g., Harrington v. Holshouser*, 741 F.2d 66, 69–70 (4th Cir.1984) (limited library access with help from untrained inmate paralegals insufficient); *Ramos v. Lamm*, 639 F.2d 559, 584–85 (10th Cir.1980)

The defendants justify the restrictions on DeMallory's access to legal assistance on the grounds that he and other inmates in the Adjustment Center are security risks. Generalized security concerns, however, are insufficient to support such a ban. Instead, prison officials must come forward with evidence that the specific contact at issue threatens security and must show that less restrictive measures, such as precounseling searches, are not possible. *See, e.g., Turner v. Safly,* —— U.S. ——, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987); *Kunzelman v. Thompson,* 799 F.2d 1172, 1179 (7th Cir.1986); *Campbell,* 787 F.2d at 225–26. WCI officials have done neither. Moreover, several genuine issues of material fact remain relating to less-restrictive measures, which precludes awarding summary judgment for the defendants at this stage. The defendants argue that DeMallory has "meaningful" access to legal assistance through the aid of LAIP lawyers, the State Public Defender's Office, and the private bar. DeMallory, however, contests this position and contends that although LAIP provides a variety of legal assistance to inmates, it does not handle conditions-of-confinement or institutional-discipline cases like his. The record also is unclear as to the availability of the Public Defender and private attorneys in assisting plaintiffs like DeMallory. In addition, a dispute exists as to whether the inmate paralegals provide an adequate substitute for counsel and whether the State can provide greater direct access to paralegals. The State argues that direct contact between inmates and paralegals would overtax prison resources because of the security risk involved in permitting paralegals into the segregated Adjustment Center. Yet the record reflects that, at least in some other limited circumstances, general population inmates were allowed into the Adjustment Center under the supervision of prison officials. A genuine dispute exists as to whether similar arrangements can be made to allow Adjustment Center inmates, like DeMallory, to confer with the prison paralegals without overburdening the prison authorities. The district court, then, erroneously concluded that the State provided DeMallory with meaningful access to the courts. Before entering judgment, it is necessary for the district court to hold a hearing to resolve these issues and to determine whether the State's legitimate security concerns justify the restrictions on DeMallory's access to legal assistance.

As an alternative basis for its decision, however, the district court held that DeMallory had failed to show prejudice and therefore failed to state a claim on which relief could be granted. Because the district court apparently misperceived the nature of the prejudice requirement, we decline to accept its conclusion. We recently emphasized that the necessary showing of prejudice is a minimal one. *Hossman v. Spradlin,* 812 F.2d 1019, 1022 (7th Cir. 1987). We require only that the plaintiff "articulate, to some degree, the basis for his claim that his access to the courts was significantly ... impaired." *Id.* at 1022. DeMallory's complaint clearly alleges that the WCI rules prevent adequate legal research and counseling. Such a complaint amounts to a sufficient allegation of prejudice to state a claim on which relief can be granted. *Cf. Walters v. Thompson,* 615 F.Supp. at 338 (similar complaint sufficient to support preliminary injunction).

Generally, we have required a showing of prejudice only where minor or indirect limitations on access to courts are alleged. Where, as here, the plaintiff alleges a direct and continuous limitation on access to legal materials or counsel, we have required no such showing. *Compare Hossman,* 812 F.2d at 1021–22 (occasional interference with library access and destruction

---

(access to untrained inmate paralegals insufficient), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Kendrick v. Bland,* 586 F.Supp. 1536, 1552 (W.D.Ky.1984) (telephonic communication with untrained inmate paralegals insufficient for prisoners without library access); *Canterino v. Wilson,* 562 F.Supp. 106, 110–12 (W.D.Ky.1983) (inmates without library access must be given access to legally-trained personnel). *Cf. Lovell v. Brennan,* 566 F.Supp. 672, 696 (D.Me.1983) (direct counseling by inmate advocate and hiring of full-time advocate for segregated prisoners sufficient), *aff'd,* 728 F.2d 560 (1st Cir.1984).

of unspecified court papers—showing of prejudice required); *Jones v. Franzen*, 697 F.2d 801 (7th Cir.1983) (limits on number of free photocopies—showing of prejudice required); *Bach v. Coughlin*, 508 F.2d 303 (7th Cir.1974) (postage regulations—showing of prejudice required); and *Isaac v. Jones*, 529 F.Supp. 175 (N.D.Ill.1981) (denial of library access on one occasion—showing of prejudice required); *with Caldwell*, 790 F.2d 589 (continuous limitation on library access—no discussion of prejudice); *Campbell*, 787 F.2d at 217 (continuous limitation on library access—no discussion of prejudice); and *Corgain*, 708 F.2d at 1241 (continuous limitation on library access—no discussion of prejudice); *see also Walters*, 615 F.Supp. at 338 (criticizing requirement of showing prejudice). In our adversary legal system, few things can be as prejudicial as the denial of basic legal resources. In essence, when an inmate complains of prison rules that substantially and continuously limit his or her access to legal materials and counseling, the complaint carries an inherent allegation of prejudice.

█ Furthermore, the record before us shows evidence of prejudice. Even WCI officials have repeatedly admitted that current rules create a "problem of legal assistance" for Adjustment Center inmates. In addition, DeMallory's reply brief in the conditions-of-confinement action was filed too late for the magistrate's consideration. Where limitations on library use prevent filing of briefs in time for the court's consideration, those limitations are sufficiently prejudicial to sustain an access-to-courts claim. *See Isaac*, 529 F.Supp. at 178–79 (by implication). We therefore find that DeMallory has shown sufficient prejudice to support his access-to-courts claim.

█ For the reasons stated, we reverse in part and remand for further proceedings consistent with this opinion.[4]

---

4. The defendants, for the first time on appeal, argue that they are entitled to immunity. Although we have doubts as to the applicability of qualified immunity to the defendants' conduct in this case, we do not decide the issue because the defendants waived this argument by failing to raise it before the district court. *Textile*

EASTERBROOK, Circuit Judge, dissenting.

Robert DeMallory, a prisoner of Wisconsin, complains about the conditions of his confinement in the Adjustment Center of the state's maximum-security penitentiary at Waupun .and about his access to law books. The Adjustment Center is the place for segregating the most incorrigible inmates in the state's charge. DeMallory was put there for instigating a riot, and in an earlier appeal we held that the state complied with the Due Process Clause in doing so. I doubt very much that there is a case or controversy about the subjects DeMallory now presents; if there is one, I doubt very much that further proceedings are necessary.

1. DeMallory was confined to the Adjustment Center between 1978 and February 12, 1988, when, his appellate counsel informs us with commendable candor, he was placed in the general population. He wants an injunction governing the operation of the Adjustment Center, but as he is not confined there he has no continuing controversy with Wisconsin about its operation. DeMallory filed the case in 1981 as a class action, but in 1983 the district court declined to certify the class, finding DeMallory a poor representative; he has not challenged this decision on appeal.[1] If he were likely to be returned to segregation the case might be "capable of repetition but evading review", see *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 16 L.Ed.2d 350 (1975); *Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Honig v. Doe*, —— U.S. ——, 108 S.Ct. 592, 601–02, 98 L.Ed.2d 686 (1988), but DeMallory does not contend that he is planning to foment another riot. Even if he were, the "capable of repetition but evading review" doctrine comes into play only when courts are unable fully to adjudicate claims arising out of acts that in their

---

*Banking Co., Inc. v. Rentschler*, 657 F.2d 844, (7th Cir.1981).

1. The caption lists only the library access case, No. 81–C–348, but the district court evidently meant to cover the conditions-of-confinement case, No. 81–C–124, as well.

nature have a short duration. The doctrine is

> limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

*Weinstein*, 423 U.S. at 149, 96 S.Ct. at 349. DeMallory's skillful appellate lawyer does not even *contend* that there is a "reasonable expectation" that he will again be placed in the Adjustment Center, let alone that, if he is, the duration of his stay will be too short to permit adjudication. DeMallory was in the Adjustment Center for ten years, long enough to litigate. He will return to the Adjustment Center only if he shows unfitness for the general population, and given his history, a future stay is unlikely to be brief. In the absence of so much as an argument on the two foundations of the capable-of-repetition doctrine, the case is moot. *Holmes v. Fisher*, 854 F.2d 229, 232 (7th Cir.1988).

*Weinstein* requires a "demonstrated probability", 423 U.S. at 149, 96 S.Ct. at 349, that the same party will again be subject to the challenged action, and nothing has been "demonstrated" (or even argued) here. The "probability" part was a subject of much debate in *Honig:* does it mean more-likely-than-not, or is some lesser likelihood enough? Whatever the minimum probability, the fact that someone is at some risk is not enough. DeMallory will be back in the Adjustment Center only if he violates the institution's rules. *Weinstein* and *Murphy* were similar: in each, the claimed injury could recur only if the plaintiff violated a rule of law and was again caught up in the criminal justice system, raising questions about bail (*Murphy*) or parole (*Weinstein*). In each case the Court thought that the chance of another cycle of violations and sanctions was too low to keep the case alive. DeMallory's situation is governed by the same rules.

DeMallory wants damages as well as an injunction, but this does not keep the case alive, for three reasons. First, many of the persons he has named as defendants have nothing to do with the conditions of which he complains—the Governor of Wisconsin, the Secretary of the Department of Health and Human Services, and so on. Section 1983 does not expose such persons to liability on account of their subordinates' acts. Second, he has not even offered to show injury from the events remaining in the case—the odoriferous living conditions and the lack of access to a law library. To keep the library claim alive, my colleagues find it necessary to hold that the prisoner need not establish injury from the lack of access. That pretty much eliminates the possibility of damages. The majority does not say that DeMallory is entitled to damages if he suffered no prejudice to the vindication of any legal claim. So too for the challenge to the conditions of confinement. We do not learn from DeMallory what the injury was, so there is no serious claim for damages.

Third, the five defendants who have something (tangentially) to do with the remaining claims—the Warden, Associate Warden for Security, and Major of Security of Waupun; the Administrator of the Division of Corrections; and the Chairman of the Wisconsin State Prison Paralegal Program—are entitled to qualified immunity as a matter of law under the standard of *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), and *Rakovich v. Wade*, 850 F.2d 1180, 1205–1210 (7th Cir.1988) (en banc). No reasonably well-trained jailer would be expected to know that the Waupun library system is unconstitutional when we have sustained more restrictive systems for a federal prison (discussed below) and when we have said that prejudice is an essential ingredient of a claim of denial of access to legal texts. A majority of all the judicial officers who have examined this case—the magistrate, the district judge, and I—believe that the defendants did not violate DeMallory's rights. How then could we say, as *Anderson* and *Rakovich* require before there may be monetary sanctions,

that any reasonably well-trained official would have understood that the acts in question were unconstitutional?

It may be that questions concerning immunity and the probability that DeMallory will again find himself in the Adjustment Center should be resolved in the first instance by the district court. The defendants' motions for summary judgment omitted the immunity point, so it is not before us although it remains for decision in the district court.[2] If the defendants prevail, and the damages claims are cleared away, there is nothing left of the case. *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). To the extent immunity has become a potentially-dispositive bone of contention, we should identify the problems and remand the case rather than deliver an advisory opinion on the off-chance that the district court might find a surviving issue.

2. There is a constitutional right of access to the courts, *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), not of access to law books. Books are tools, not ends in themselves. While in the Adjustment Center, DeMallory had access to law books. The Adjustment Center uses the same system as the Library of Congress: the patron must request a book by title, using the information gleaned

from finding aids and requests to the staff. It is a closed-stacks system. True, the access was on terms DeMallory found inconvenient, but inconvenience is not unconstitutional. We so held in *Hossman v. Spradlin*, 812 F.2d 1019, 1021–22 (7th Cir. 1987), adding that unless the prison's rules hamper the pursuit of a legal claim, the need to jump through hoops to get law books is no constitutional defect. See also *Bruscino v. Carlson*, 854 F.2d 162, 167 (7th Cir.1988) ("a showing [of prejudice] is required in a case alleging a denial of access to the courts."); *Howland v. Kilquist*, 833 F.2d 639, 642–43 (7th Cir.1987); *Jones v. Franzen*, 697 F.2d 801, 803 (7th Cir. 1983); *Bach v. Coughlin*, 508 F.2d 303, 308 (7th Cir.1974).[3] DeMallory had to jump through hoops, no doubt, but he had leaping ability. An illiterate prisoner might find Wisconsin's system an insuperable obstacle—but then an illiterate prisoner would find a law library of no use either. Giving an illiterate the run of the stacks is like giving an anorexic a free meal at a three-star restaurant. DeMallory is literate, and the record is filled with his lucid prose, including many legal citations. The documents he filed are better than some we see from members of our bar. Neither his complaint nor his briefs on appeal (one pro se and another filed by counsel) identifies

**2.** My colleagues say (maj. op. 449 n. 4) that the defendants have "waived this argument by failing to raise it before the district court." The answer to the library-access complaint sets out as an affirmative defense that "[t]he defendants, at all times relevant to this action, have acted in good faith, and have exercised professional judgment in accordance with established correction policies and the applicable law." The answer to the conditions-of-confinement complaint includes almost identical language. This does not employ the magic word "immunity", but it raises the point. DeMallory filed in 1981 a "motion for more definite statement" recognizing that this was a claim of official immunity. The defendants' motion for summary judgment was limited to the merits, but the omission of an issue from a motion does not "waive" it; no rule comparable to Fed.R.Civ.P. 12(h) requires a party to include all issues in every motion for summary judgment on pain of surrendering the point. Rule 56(b), which speaks of motions directed to "all or any part" of a claim looks in the opposite direction. If the defendants had filed a motion for summary

judgment raising only their immunity defense and had prevailed, would we say (if reversing that judgment) that they had "waived" all defenses on the merits? If filing a motion based on immunity does not waive defenses based on the merits, how does filing a motion directed to the merits waive defenses based on immunity?

**3.** But see *Williams v. Lane*, 851 F.2d 867, 878–879 (7th Cir.1988), holding that Illinois violates the first and fifth amendment rights of inmates in "protective custody" by affording them "access ... severely inadequate in comparison to that afforded the general population." The panel did not discuss why the rights of the general population are the right benchmark—can otherwise-constitutional library privileges of one group of inmates suddenly become unconstitutional because the state expands some other group's privileges?—and did not cite *Hossman* or *Howland* or find that the system employed by the prison in question had hampered any inmate's presentation of a sound legal claim. *Bruscino* did not cite or distinguish *Williams*.

any legal claim that was hampered by the way prisoners in the Adjustment Center get access to law books. That dooms his contention that the restrictions on his access to law books were unconstitutional. See *Howland,* 833 F.2d at 642 ("This court has consistently found that some showing of detriment caused by the challenged conduct must be made in order to succeed on a claim alleging a deprivation of the right to meaningful access to the courts."); *Hossman,* 812 F.2d at 1021 & n. 2; *Bruscino,* at 167.

The majority says that "[i]n *Corgain v. Miller,* 708 F.2d 1241 (7th Cir.1983), this court held a system functionally similar to WCI's constitutionally inadequate." Slip op. 6. Although the systems have their similarities, the differences are more important. *Corgain* dealt with the system then employed by the federal prison at Marion, Illinois, to handle litigation by state prisoners, who Marion had accepted in its capacity as the most secure prison in the nation. No state prisoner could get any information on his state's law without providing volume and page citations; yet without any finding aids, no prisoner could provide them. The court held that Marion's system was unconstitutional but added that it would be constitutionally sufficient to provide finding aids (digests, treatises, and the like) from which pinpoint citations could be derived. 708 F.2d at 1248–51. Wisconsin does not require the prisoners in the Adjustment Center to cite specific pages without aid. It requires citations to *volumes,* but the prisoner's first volume may be a treatise, digest, or other finding aid; Wisconsin offers (as Marion did not) the assistance of law students, public defenders, and inmate paralegals to obtain those "starter" citations. This looks to me like what *Corgain* said would comply with the Constitution. The system allowed DeMallory to find and cite cases on point in this litigation.

To say, as my colleagues do, that a prisoner need not show "prejudice" from a violation of his entitlements not only goes against the law of the circuit but also misunderstands the nature of the right. It is not as if a right (to books) has been violated, and we have to determine whether a showing of prejudice is needed to get relief for the violation. Since the right is one of access to the courts, a prisoner who is able to place all legitimate grievances before a court has received his due. A demonstration of inability to present a legal claim is an essential ingredient of a suit such as this because the prisoner must be able to show that the rules interfered with his entitlement (access to the courts) rather than with a mere instrument for vindicating an entitlement (access to books). When a prisoner who has had full access nonetheless contends that the law library services are not adequate, he is making a contention that affects only third parties, and thus inviting us to overstep the bounds of judicial authority. It is as if a prisoner who always has received adequate medical care files a suit contending that the prison's physicians are not adequately trained, that the infirmary is poorly equipped, and so on. Such shortfalls might cause harm, but unless they have worked to the plaintiff's detriment he is not the right person to protest them. DeMallory's objection to the terms on which inmates secure law books is no different from this hypothetical objection to the medical facilities of the prison. So we lack power under Art. III for two reasons: the case is moot, and DeMallory's own rights were not at issue.

A word on procedure. The court remands the case for further evidentiary proceedings, on the assumption that if the complaints state claims for relief there must be procedures to test the allegations. There are two problems.

First, the district court gave DeMallory an opportunity to prove his claims. The complaint dealing with access to law books was filed in April 1981. Desultory discovery ensued. In January 1986 the defendants filed four sworn answers to DeMallory's interrogatories and, on the basis of these answers, a motion for summary judgment. The cover letter informed DeMallory that "any factual assertion in the ... documents submitted or referred to in support of defendants' Motion will be accepted by the District Judge as true unless

you submit Affidavits or other documentary evidence contradicting the assertion." To the letter and motion, the defendants attached a copy of Fed.R.Civ.P. 56. DeMallory therefore did not need to do legal research; he knew that he could not stand on the averments of the complaint, Rule 56(e), and that if he needed more time to gather evidence, he had to file an affidavit to that effect, Rule 56(f). DeMallory neither submitted evidence nor filed a Rule 56(f) affidavit. He instead filed a brief addressing only points of law. Prisoners are not immune from the requirements of Rule 56, e.g., *Hossman*, 812 F.2d at 1022 & n. 6; cf. *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982), so there is nothing more to do. The shortfall in DeMallory's response is factual, unrelated to any burdens in obtaining access to law books. The record contains the evidence DeMallory wants to put in it, and that evidence is not enough to survive the motion for summary judgment.

Second, to the extent there are disputes about the need to treat inmates as Wisconsin does, these disputes are not resolved by taking evidence and deciding the issue de novo. Prison officials, not district judges, decide whether the inmates in segregation are so dangerous that written requests to inmate paralegals rather than face-to-face meetings are appropriate. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safly,* — U.S. —, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). "Reasonable relation" in constitutional law is assessed by looking at the logical connection between means and ends, not by taking evidence and deciding where the "truth" lies. *Vance v. Bradley,* 440 U.S. 93, 110–12, 99 S.Ct. 939, 949–950, 59 L.Ed.2d 171 (1979); *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986); *Citizens for John W. Moore Party v. Board of Election Commissioners,* 794 F.2d 1254, 1257–58 (7th Cir.1986). As the Court said in *Rast v. Van Deman & Lewis Co.,* 240 U.S. 342, 357, 36 S.Ct. 370, 374, 60 L.Ed. 679 (1916), and reiterated in *Vance:*

It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety.

See also, e.g., *McGinnis v. Royster,* 410 U.S. 263, 274, 93 S.Ct. 1055, 1061, 35 L.Ed. 2d 282 (1973) (sustaining a law because the legislature "could have concluded rationally that" certain facts are true); *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). "Adjudicatory" facts may be freely reviewed; "legislative" facts—those on which the validity of classifications or rules depend— are for law-givers, and courts may ask only whether the rulemaker rationally could have entertained the beliefs that support the rule. Ours is a case about legislative rather than adjudicatory facts; a court may ask no more than whether Wisconsin reasonably could have believed that greater access to books posed unacceptable risks to the safety of inmates and staff.

Cases such as *McGowan* and *Munro* involved review of laws, while ours involves a rule established by administrative officials. What matters for these purposes, however, is the quality of the subject *as rule.* Wisconsin could have established the library-access rules by statute. That it chose a different way does not give a federal court greater freedom to say that the rule is unconstitutional. So far as the federal courts are concerned, a state is a state; how it chooses to make rules of general application is an internal concern. *Whalen v. United States,* 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980); *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 1330 n. 13, 39 L.Ed.2d 630 (1974); *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 225, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908); *Dreyer v. Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902); *United Beverage Co. v. Indiana Alcoholic Beverage Comm'n,* 760 F.2d 155 (7th Cir.1985). The Fifth Circuit has applied to the decisions of a single

state-operated hospital the same rational-relationship test employed to assess the validity of state laws. *Stern v. Tarrant County Hospital District*, 778 F.2d 1052, 1060–61 (5th Cir.1985) (en banc). This is an inevitable consequence of the principle that states need not allocate "legislative" powers to particular officials. When a "legislative" decision has been made, neither its constitutional status nor the means used to prove unconstitutionality depend on the identity of the decisionmaker.

It is rational (reasonable, too) for prison officials to conclude that inmates segregated in the maximum-security prison on account of violence should be required to communicate in writing rather than in person with other inmates; we sustained a more severe restriction on library access on that account in *Caldwell v. Miller*, 790 F.2d 589, 607 (7th Cir.1986), and *Campbell v. Miller*, 787 F.2d 217, 225–29 (7th Cir.1986). The decision whether this reasonable inference is sustained in fact is for the state rather than the courts—if for no other reason than that "how safe is safe enough" is inescapably a decision of state policy. Establishing the quantum of risk to tolerate, and the costs to be borne to reduce risks within prisons, are legislative decisions. If we were confident that at small cost a state might produce a large improvement in access to the courts, we might say that the state's choice was not rational in relation to its burden. But DeMallory has not shown how a policy designed at improving safety (and saving costs) has injured any interest he has in access to the courts—and the majority says he doesn't need to. There is therefore no basis for overturning a rational decision by the officials Wisconsin has charged with making such decisions. If there is a case or controversy, the judgment with respect to the law library should be affirmed.

3. DeMallory's objections to the conditions in the Adjustment Center have boiled down to three: that inmates set fires, causing smoke inhalation; that inmates' personal hygiene is not the best, so the odor of excrement is in the air; and that guards clean toilet and face bowls twice a week with the same brush. DeMallory does not contend that prison officials neglect to put out fires or clean up other inmates' filth when they can. Prison officials are not responsible for the low standards of hygiene and safety of their charges; they can't tell the courts to send a better class of prisoner! The challenge to the cleaning is picky at best, since twice a week is more often than most people clean their own bathroom appliances, and there is no indication that when the guards are done the face bowls are unsanitary. They apparently use strong caustic agents, which kill bacteria—so strong that the guards do not want the prisoners to have access to the agents, useful as weapons.[4]

I grant that the procedure in this case was deficient, but the deficiencies do not matter. The defendants' answer, filed in 1981, denied that they "have sufficient information as to form a belief as to the truth of the allegations" about the conditions of confinement—a shocking admission from the Warden of Waupun if true, and a violation of Rule 11 if the defendants' lawyer was simply too lazy to investigate before filing. In February 1986, when the defendants moved for summary judgment, they ignored claims concerning the conditions of confinement; so did the magistrate when recommending that the district court grant the motion. The omission did not leave an empty record, however; sworn answers to interrogatories supplied an evidentiary basis for decision. DeMallory's objection to the magistrate's recommendation mentioned only the fires and the difficulties the smoke caused to other prisoners in the Adjustment Center.[5] This waived any remaining claims, *Lockert*

4. According to a letter to the Governor that DeMallory submitted as an exhibit, one inmate stockpiled the stuff for offensive use until the prison discovered the cache and stopped allowing the prisoners access to caustic agents.

5. His objection, styled a "reply brief", concentrated on his due process objection to placement in the Adjustment Center, which we addressed in an earlier appeal, and mentions the fires and the spitting incident in passing. It covers nothing else.

*v. Faulkner*, 843 F.2d 1015 (7th Cir.1988). My colleagues' observation that the "district court failed to address" (slip op. 445) claims concerning unsanitary conditions was a natural consequence of DeMallory's failure to raise these matters before that court. The district judge addressed every issue DeMallory presented to that court. Must a district judge address issues that, under the law of this circuit, have been waived?

The protest about smoke is simply too insubstantial to require more litigation. DeMallory does not deny that prison officials obtained medical aid for those who suffered from smoke inhalation. Although he (and everyone else) would prefer clean to smoky air, the Eighth Amendment does not require prison officials to do the impossible. Nothing even hints at "deliberate indifference" to the *serious* medical needs of the prisoners in the Adjustment Center; DeMallory, in particular, does not allege that he suffered *any* adverse effect from smoke inhalation. "[T]he Constitution does not give inmates the right to be free from all discomfort. The issue with regards to ventilation is the same as with all alleged constitutional violations—does the condition amount to ... *cruel and unusual punishment* of convicted inmates." *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir.1986) (emphasis in original). The prison carted many inmates, including DeMallory, off to hospitals after serious fires, but all the record shows—indeed, all DeMallory *claims*—is that this was precautionary. Nothing so much as hints at a policy of deliberately injuring prisoners or leaving them to suffer after being injured. A prison can put a stop to fires only by taking combustibles (mattresses, blankets, clothes) away from prisoners, and that step undoubtedly *would* violate the Eighth Amendment if applied to all prisoners for the duration of their confinement. So there is nothing to litigate here, unless we are to punish the defendants and the magistrate for their oversights by forcing them to trek through this record to its inevitable outcome a second time. Other litigants awaiting their first adjudication deserve the scarce judicial time. DeMallory has had his chance—this case is seven years old—and has produced nothing requiring a court to throw good time after bad.