Filed:  August 31, 2010

UNITED STATES COURT OF APPEALS
                       FOR THE FOURTH CIRCUIT
                    _____

                         No. 06-7770(L)
                       (7:06-cv-00576-GEC)
                    _____

DON JUAN TORRES,

              Plaintiff - Appellant,

         v.

R. O'QUINN; D. TATE; D. MUNCY,

              Defendants - Appellees.

                    _____

                         O R D E R
                    _____

         The Court amends its opinion filed July 13, 2010, as
follows:

         On page 4, line 6 -- "twenty percent of" is added
following "an initial payment of."

         On page 11, lines 3 and 4 -- the word "filling" is
corrected to read "filing."

                              For the Court – By Direction

                              /s/ Patricia S. Connor
                                        Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DON JUAN TORRES,

*Plaintiff-Appellant,*

v.

R. O'QUINN; D. TATE; D. MUNCY,

*Defendants-Appellees.*

No. 06-7770

DON JUAN TORRES, a/k/a Donald Hautz,

*Plaintiff-Appellant,*

v.

GENE JOHNSON; LARRY HUFFMAN; TRACY RAY; JOHN JABE; R. ROWLETT; M. MULLINS,

*Defendants-Appellees.*

No. 07-7340

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Glen E. Conrad, District Judge.
(7:06-cv-00576-GEC; 7:07-cv-00398-GEC)

Argued: December 1, 2009

Decided: July 13, 2010

Before NIEMEYER, GREGORY, and DAVIS,
Circuit Judges.

Judge Davis authored a Supplemental Opinion Denying Appellant's Post Judgment Motion for Partial Refund of Filing Fees in which Judge Gregory joined. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED**: Tonya T. Robinson, WILMERHALE, Washington, D.C., for Appellant. Mark R. Davis, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** June Shih, WILMER-HALE, Washington, D.C., for Appellant. William C. Mims, Attorney General, Richmond, Virginia, for Appellees.

---

## OPINION

DAVIS, Circuit Judge:

Appellant Don Juan Torres, a/k/a Donald Hautz ("Torres"), while an inmate at a Virginia prison, filed two civil actions against prison officials in federal court; each case was promptly dismissed for failure to state a claim. When he appealed to this court, we ordered, pursuant to the Prison Litigation Reform Act of 1995, Title VIII of Pub. L. No. 104-134, 110 Stat. 1321 (1996), amending 28 U.S.C. § 1915 *et seq.* ("PLRA"), that Torres pay the filing fees for the appeals even as an indigent prisoner. Consequently, Virginia corrections officials commenced withholding forty percent of Torres's "preceding month's income credited to [his] account" from his prison trust account, rather than the twenty percent mentioned in 28 U.S.C. § 1915(b)(2), to satisfy the filing fee requirement for his two appeals. Torres objected to the forty percent exaction and has filed a motion for a refund of the fees collected from his account in excess of twenty percent.

For the reasons that follow, we conclude, in agreement with Torres, that 28 U.S.C. § 1915(b)(2) permits only twenty percent of an inmate's preceding month's income to be withheld from a trust account, notwithstanding that, as here, the inmate had two *in forma pauperis* appeals pending before this court. On the merits of Torres's request for a refund, however, we conclude that although we have the authority to order a refund, under the circumstances in these cases, we decline to do so.

I.

Torres was an inmate at the Red Onion State Prison ("ROSP") in Virginia. He filed two civil actions in the United States District Court for the Western District of Virginia against prison officials during his imprisonment. In the first case, Torres complained that prison officials failed to repair a malfunctioning night-light in his prison cell, resulting in a disturbing "strobe" effect. J.A. 4-7. The district court promptly dismissed the action *sua sponte* pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. *Torres v. O'Quinn*, No. 7:06-cv-00576-GEC, 2006 WL 2850642 (W.D. Va. Sept. 29, 2006). We affirmed the judgment of dismissal by per curiam opinion. *Torres v. O'Quinn*, No. 06-7770, 2007 WL 143081 (4th Cir. Jan. 22, 2007) (unpublished). One year later, Torres filed a complaint in district court asserting that a constitutional violation inhered in the prison's prohibition of his subscription to commercially available pictures of nude women. J.A. 47-72. The district court also dismissed that action (again, *sua sponte*) pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. *Torres v. Johnson*, No. 7:07-cv-00398-GEC, 2007 WL 2570217 (W.D.Va. Aug. 31, 2007). Again, upon Torres's appeal, we affirmed. *Torres v. Johnson*, No. 07-7340, 2008 WL 2115474 (4th Cir. May 20, 2008) (unpublished).

In connection with each of his two appeals, as an indigent prisoner, Torres proceeded under the relevant sections of the

PLRA, filing an Application for Leave to Proceed Without Prepayment of Fees, a Consent to Collection of Fees from Trust Account, and a copy of his trust account statement. J.A. 124-33, 189-91. On November 6, 2006, and February 20, 2008, respectively, we granted each of Torres's applications, ordering that an initial payment of twenty percent of the greater of his average monthly deposits or monthly balance from the six months before filing of each appeal be collected as an initial payment. J.A. 135-37, 192-94. In each such order, in accordance with the PLRA, we directed prison officials to withhold and forward to the clerk of the district court, twenty percent of Torres's monthly deposits when his income exceeded $10 until the full filing fee was discharged. *Id.* In March 2007, ROSP officials began withdrawing money, at the twenty percent rate, from Torres's account to pay the filing fee for his first appeal. Beginning on June 26, 2008, however, after they received our February 20, 2008, order for the second appeal, ROSP officials began withdrawing forty percent, i.e., twenty percent per appeal. When, periodically, the district court received the funds so withheld, it applied the full amount to the filing fee of Torres's first appeal. J.A. 174.

On September 23, 2008, Torres sent a letter to the district court challenging the propriety of the excessive withdrawals. In this letter, he insisted that there must have been an error in the collection of fees from his prison account. J.A. 175-77. On October 28, 2008, the district court (through its *pro se* law clerk) responded to Torres and advised him that all the money that had been withheld from his account was being applied to the fee related to the first appeal, and that after that fee is paid in full, the money withheld would then be applied to his second appeal. J.A. 174. The district court also advised Torres that any objection to the amount of withholding should be addressed to this court. *Id.* We construed Torres's objection as a motion for return of fees and appointed counsel to present argument on his behalf. The Attorney General of Virginia has entered an appearance to defend the prison's practice of withholding twenty percent of an inmate's account (or income, as

the case may be) for each and every appeal for which an inmate owed fees, without regard for the twenty percent exaction mentioned in the PLRA. We have jurisdiction to review the propriety of the implementation of our prior orders.[1]

## II.

The PLRA, enacted in 1996, changed the landscape of prisoner litigation. Congress required that indigent prisoners filing lawsuits be held responsible for the full amount of filing fees. Section 1915(b) sets forth the requirements for the payment of fees by prisoners filing suit in federal court. If an indigent inmate is unable to pay the full fee at once, he may be ordered to make an initial "partial payment" of the filing fee. After the initial partial payment, such a prisoner goes on a "monthly payment plan" until the filing fee is fully discharged. The portions of § 1915(b) relevant in this case state:

> (b)(1) Notwithstanding subsection (a), if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of—

---

[1]Because the continuing collection of appellate filing fees is ancillary to this court's original jurisdiction over Torres's appeals, we have jurisdiction to decide this issue. *See Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (finding that federal courts may exercise ancillary jurisdiction to enforce its judgments).

We note that, in response to an order we issued after argument, counsel for the parties have confirmed that, as disclosed by a search of public records, Torres has been released from the Virginia prison system. *See* http://www.vadoc.virginia.gov/offenders/locator/index.cfm. Nevertheless, as counsel have urged, the case presents no issue of mootness. *See infra* pp. 23-24.

(A) the average monthly deposits to the prisoner's account; or

(B) the average monthly balance of the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

(2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

28 U.S.C. § 1915(b)(1)&(2). The question presented here is whether § 1915(b)(2) allows only a maximum of twenty percent to be taken from a prisoner's monthly income regardless of the number of cases or appeals filed, or does the statute require (or permit) twenty percent be taken each month for *each case* or *appeal* that the prisoner files; that is, does the financial exaction from the inmate pursuant to § 1915(b)(2) imply no statutory cap, or can it climb to nearly one hundred percent of the monthly deposits to the trust account?[2]

### A.

Although the question is an open one in this circuit, there is a split of authority among our sister circuits: the Fifth, Seventh, and Eighth Circuits have interpreted § 1915(b)(2) to

---

[2]Presumably, inasmuch as Congress ordered that the twenty percent periodic withdrawal from an inmate's trust account would only be proper when "the amount in the account exceeds $10," 28 U.S.C. § 1915(b)(2), the withdrawals could never cause an inmate's trust account to fall below $8.01.

require prisoners to pay twenty percent of their funds towards filing fees *per case and per appeal*; the Second Circuit has interpreted the statute to cap the payment of fees at twenty percent of the prisoner's income, regardless of the number of cases or appeals for which the prisoner is indebted.[3] We join the Second Circuit and hold that § 1915(b)(2) requires that no more than twenty percent of an inmate's monthly income be deducted to pay filing fees, irrespective of the total number of cases or appeals the inmate has pending at any one time. We so hold because we find that the most plausible reading of the statute, in light of Congress' intent as reflected in legislative history and the structure of the statute, and in the face of a looming constitutional question posed by the alternative interpretation, together dictate that, in no instance should the monthly withholdings for filing fees exceed twenty percent of the inmate's income from the preceding month.

1.

The Fifth Circuit has concluded that §§ 1915(b)(1) and (b)(2) are unambiguous and that their meaning can be determined by a plain reading of the statutory language. *See Atchinson v. Collins*, 288 F.3d 177, 180 (5th Cir. 2002) (per curiam). The court reasoned that the word "court" appearing in both § 1915(b)(1) and (b)(2) should be read to refer to the "instant action," separate from previously filed lawsuits. *Id.* at 180-81. The Fifth Circuit also noted that if it interpreted § 1915(b)(2) to cap withdrawals at twenty percent per inmate, then if an inmate files actions in two different courts, "the clerk" in the statute would refer to two different people — a result that would make it impossible to determine which clerk

---

[3]The D.C. Circuit has suggested in *dicta* that it would follow the Second Circuit's approach. *See Tucker v. Branker*, 142 F.3d 1294, 1298 (D.C. Cir. 1998)("[T]he payment requirement of the PLRA *never* exacts more than 20% of an indigent prisoner's assets or income.") (emphasis added). *But see D'Alfonso v. Holder*, No. 09-1971 (RBW), 2010 WL 604659 at *2 (D.D.C. Feb. 22, 2010) (declining to cap fees at twenty percent).

would collect the fee. *Id.* at 181. The court rejected the notion that "the court" mentioned in the statute refers to a single court, regardless of the number of suits the prisoner filed, hypothesizing that an inmate could file a civil suit in the Eastern District of Texas and another in the District of Columbia. *Id.* The Fifth Circuit found that ordering the inmate to pay twenty percent per case would decrease the "confusion" surrounding which courts would receive the fees when a prisoner files more than one suit. *Id.* Additionally, the Fifth Circuit concluded that there was no constitutional quandary with a "per case" interpretation because, according to that court, "the Supreme Court has held that indigent persons have no constitutional right to proceed in forma pauperis." *Id.* (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996)).

The Fifth Circuit's concern for consistency is misplaced: although the statute mentions that "the court shall assess . . . and collect," the clerk of the court is responsible for collecting the filing fees only in the sense that the clerk "receives" the fees. Plainly, it is the agency having custody of the prisoner that "collects" the fees, in the sense that the agency "gathers together" the money to make payment to the court clerk. *See Random House Unabridged Dictionary* 402 (2d ed. 1993) (defining "collect"). Under a per inmate collection scheme, a prison would collect the funds to pay the fees accrued by a specific inmate, and then distribute those funds to the appropriate court until that court's fees are paid in full. After satisfying the first court, the prison would continue to collect funds and use them to pay the next court in sequence. There is no "confusion" in such a scheme requiring "elimination."

Moreover, the Fifth Circuit's casual dismissal of the inchoate constitutional impediment to its interpretation of the PLRA filing fee provision is deeply troubling. It simply is not true that "[t]he Supreme Court has held that indigent persons have no constitutional right to proceed in forma pauperis." *Atchinson*, 288 F.3d at 181. The very case cited by the Fifth Circuit for that proposition reaches exactly the opposite hold-

ing. Specifically, the Supreme Court concluded that a mother in Mississippi could not be denied appellate review in a termination of parental rights action solely because she could not pay the fees to compile the record necessary for appeal, stating, "we hold that Mississippi may not withhold from M. L. B. a record of sufficient completeness to permit proper [appellate] consideration of [her] claims." *M.L.B.*, 519 U.S. at 128 (citing *Mayer v. Chicago*, 404 U.S. 189, 198 (1971)) (internal quotations omitted).[4] Thus, as the Supreme Court has made clear, there are indeed certain fundamental rights whose vindication in a judicial forum are sufficiently profound that the government may not deny access to that forum on the basis of poverty. *Id.*

2.

Unlike the Fifth Circuit, the Seventh Circuit has correctly noted that the difficulty here is not in wrestling with the "plain language" of the statute; rather, the problem is that "[t]he stat-

---

[4]The full statement of the Court's holding was as follows:

> May a State, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, condition appeals from trial court decrees terminating parental rights on the affected parent's ability to pay record preparation fees? We hold that, just as a State may not block an indigent petty offender's access to an appeal afforded others, *see Mayer v. Chicago*, 404 U.S. 189, 195-96, 92 S.Ct. 410, 415-416, 30 L.Ed.2d 372 (1971), so Mississippi may not deny M. L. B., because of her poverty, appellate review of the sufficiency of the evidence on which the trial court found her unfit to remain a parent.

*M.L.B.*, 519 U.S. at 107. *See Lyon v. Krol*, 127 F.3d 763, 765 (8th Cir. 1997) (describing *M.L.B.* as "summarizing cases where court fees must be waived if they prevent litigants from vindicating basic fundamental rights."). What the Fifth Circuit cites is the Court's recognition "that a constitutional requirement to waive court fees in civil cases is the exception, not the general rule," *M.L.B.*, 519 U.S. at 114, a far cry from a description of a flat holding that "indigent persons have no constitutional right to proceed in forma pauperis." *Atchinson*, 288 F.3d at 191 (citing *M.L.B.*, 519 U.S. at 119).

ute does not tell us whether the 20 percent-of-income pay-ment is per case or per prisoner." *Newlin v. Helman*, 123 F.3d 429, 436 (7th Cir. 1997), *overruled in part on other grounds by Lee v. Clinton*, 209 F.3d 1025 (7th Cir. 2000), *and Walker v. O'Brien*, 216 F.3d 626 (7th Cir. 2000). The court adopted the "per case" interpretation based on its finding that the PLRA was "designed to require the prisoner to bear some marginal cost for each legal activity," and "[u]nless payment begins soon after the event that creates the liability, this will not happen." *Newlin*, 123 F.3d at 436 In other words, the court was concerned that "[a] prisoner could file multiple suits for the price of one, postponing payment of the fees for later-filed suits until after the end of imprisonment," when collec-tion of the fee would perhaps be difficult or impossible. *Id.* Finally, dismissing *sub silentio* the argument that a prisoner might face a constitutionally-suspect limitation on his access to courts if trust fund exactions were not capped at twenty percent and not collected sequentially, the Seventh Circuit reasoned, skeptically, that "[f]ive suits or appeals mean that the prisoner's entire monthly income must be turned over to the court until the fees have been paid–though by then a pris-oner is likely to have three strikes and to owe all future filing fees in full." *Id.*[5]

We agree with the Seventh Circuit that the PLRA is not ambiguous; rather, it is simply *silent.* ("The statute does not tell us whether the 20 percent-of-income payment is per case or per prisoner."). Still, the Seventh Circuit's reasoning leaves much to the imagination, and does little to advance the neces-sary statutory analysis. The court employs a number of highly debatable assumptions: (1) that prisoners only file suits that are "frivolous," "malicious," or "fail to state a claim upon which relief can be granted," *see* 28 U.S.C. § 1915A(b)(1);[6]

---

[5]The Eighth Circuit followed the Seventh Circuit's lead without elabo-ration. *Lefkowitz v. Citi-Equity Group, Inc.*, 146 F.3d 609, 612 (8th Cir. 1998).

[6] *But see* Roger Roots, *Of Prisoners and Plaintiff's Lawyers: A Tale of Two Litigation Reform Efforts*, 38 Willamette L. Rev. 210, 221-22 (2002) (discussing examples of successful civil rights suits brought by pro se inmate-litigants).

(2) that most prisoners who file numerous suits are serving relatively short sentences, and thus will be released before all unpaid filing fees can be collected from their trust accounts; and (3) that Congress is powerless to collect unpaid filing fees from prisoners after they are released.[7] We decline to engage in such factfinding under the circumstances here.[8]

3.

The Second Circuit has held that the collection of filing fees under § 1915(b)(2) must be pursuant to the "per inmate" interpretation. *Whitfield v. Scully*, 241 F.3d 264, 276 (2d Cir. 2001). The court acknowledged that a "per inmate" interpreta-

---

[7]Indeed, although we have held that a released prisoner who complies with the PLRA while incarcerated will not be bound to pay outstanding fees after he is released, other circuits have ruled to the contrary. *Compare DeBlasio v. Gilmore*, 315 F. 3d 396, 397 (4th Cir. 2003) ("We hold that the PLRA fee requirements are not applicable to a released prisoner (assuming the prisoner made any required payments while in prison) and that his obligation to pay filing fees is determined by evaluating whether he qualifies under the general in forma pauperis provision of 28 U.S.C. § 1915(a)(1)."), *with Gay v. Texas Dep't of Corrs State Jail Div.*, 117 F.3d 240, 241 (5th Cir. 1997) ("We hold that a person who files a notice of appeal while in prison is subject to the filing-fee requirements of the PLRA despite subsequent release from prison.").

[8]District courts in the Sixth and Ninth Circuits have also followed the "per case" interpretation of § 1915. *See Hendon v. Ramsey*, 478 F. Supp. 2d 1214, 1219 (S.D. Cal. 2007) (adopting the Fifth Circuit's reasoning in *Atchinson* that § 1915 requires a "per case" withdrawal of fees); *Samonte v. Frank*, 517 F. Supp. 2d 1238, 1243 (D. Haw. 2007) (finding that the "per case" interpretation of § 1915 was a more practical interpretation); *Lyon v. Kentucky State Penitentiary*, No. 5:02CV-P53-R, 2005 WL 2044955 at *1 (W.D. Ky. Aug. 23, 2005) (recognizing that the Sixth Circuit has not directly addressed this issue, but finding that the Sixth Circuit implicitly adopted the "per case" interpretation in *McGore v. Wriggles-worth*, 114 F.3d 601 (6th Cir. 1997)); *Suggs v. Caballero*, 2007 WL 541909 at *1 (E.D. Mich. Feb. 16, 2007) (disagreeing that the Sixth Circuit implicitly adopted the "per case" interpretation, but adopting the "per case" interpretation because it is a "better interpretation"). Neither the Sixth Circuit nor the Ninth Circuit have directly addressed the issue.

tion might create a lesser deterrent for prisoners filing law-suits because they are able to delay the payment of their filing fees. Nevertheless, the court concluded that the "per case" interpretation could raise the constitutional problem of equal access to the courts by possibly recouping one hundred per-cent of an inmate's income for filing fees, and accordingly adopted the "per inmate" interpretation. *Id.* at 276-77. It stated, "[o]ur resolution of this question . . . must be guided by the principle that we should 'avoid an interpretation of a federal statute that engenders constitutional issues if a reason-able alternative interpretation poses no constitutional ques-tion.'" *Id.* at 277 (quoting *Gomez v. United States*, 490 U.S. 858, 864 (1989)).[9]

## B.

### 1.

On the issue of whether fees are to be collected simulta-neously or sequentially, we are called upon to determine what Congress would have done had it thought about the problem, not interpret an ambiguous statute. *Cf. Newlin*, 123 F.3d at 436. We think the most valuable interpretive clue arising from a focus on the "plain text" of the filing fees provisions of the PLRA is the one urged by counsel for Torres, namely, that § 1915(b)(1)'s specific reference to the "payment of *any* court fees" (emphasis added) suggests that the twenty percent exac-tion applies to *all* court fees, in total. Indeed, we have fol-lowed the canon of statutory construction that unless

---

[9]District courts in the First and Third Circuits have adopted *Whitfield's* "per inmate" interpretation for the collection of filing fees from prisoners, though neither circuit has addressed the issue directly. *See LaFauci v. Cunningham*, 139 F. Supp. 2d 144, 147 (D. Mass. 2001) (finding that a "per case" interpretation could possibly present a problem by denying inmates access to the courts); *Fortune v. Patterson*, No. 04-377, 2009 WL 3166274 at *4 (W.D. Pa. Sept. 28, 2009) (holding that § 1915 mandates that filing fees are deducted from a prisoner's monthly income at a rate not greater than 20 percent).

otherwise defined in the statute, "words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Lehman*, 225 F.3d 426, 428 (4th Cir. 2000) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Under our own circuit's statutory construction of the word "any," the phrase "payment of any court fees" should be construed to mean the "payment of any [and all] court fees." *See United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir. 2002) (citing *Webster's Third New International Dictionary* 97 (2d ed. 1981)) ("when the word 'any' is 'used as a function word to indicate the maximum or whole of a number or quantity,' for example, 'give me [any] letters you find' and 'he needs [any] help he can get,' the word 'any' means 'all.'"); *see also Webster's New Universal Unabridged Dictionary*, 96 (1st ed. 2003) (defining "any" as "every; all"). Consequently, § 1915(b) requires that no more than twenty percent be taken from an inmate's monthly income to pay for "all" court fees. So construed, therefore, § 1915(b) as a whole suggests that even if the fees encompass more than one suit and/or appeal, §§ 1915(b)(1) and (b)(2) forbid deducting more than twenty percent of the inmate's income for monthly payments of *all* the court fees from *all* suits in the aggregate.[10]

### 2.

But here, as in many statutory interpretation exercises, reliance on text alone can lead to a dead end. *Cf. Holloway v. United States*, 526 U.S. 1, 7 (1999) ("As we have repeatedly stated, '"the meaning of statutory language, plain or not, depends on context."'") (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (quoting *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991))). Unlike the Fifth, Seventh, and Eighth

---

[10]We need not go so far, however, for here the question is whether the monthly payments required by § 1915(b)(2) may be collected sequentially or *must be* collected simultaneously. No issue is presented as to whether an initial "partial payment" of filing fees must be withheld for every case and every appeal.

Circuits, we are not persuaded by the concern that prisoners would no longer be held liable for the payment of their filing fees if "only" required to pay a twenty percent maximum of their monthly income regardless of how many suits are filed or appeals noted, and would start filing suits against prison officials willy nilly. First, the "per inmate" reading of § 1915(b)(2) does not relieve inmates of their responsibility under the PLRA of paying their filing fees; it is merely a question of timing and not a waiver of fees at all. An inmate filing suit will still have to fully pay his filing fees. Adopting a "per inmate" interpretation of § 1915(b)(2) would not open up a "floodgate" of litigation from prisoners since prisoners would still be accountable for the filing fees under the PLRA. Second, the PLRA's "three strikes" provision, 28 U.S.C. § 1915(g), should quell any fear that a twenty percent cap on withdrawals would not provide adequate deterrence to continued filing of frivolous suits. Section 1915(g) prohibits prisoners from filing suits *in forma pauperis* if they have had three prior suits dismissed as frivolous, malicious, or for failure to state a claim, unless they are in imminent harm of physical danger. 28 U.S.C. § 1915(g).

Furthermore, under a "per case" interpretation, inmates may find themselves in situations where they no longer have *any* income after the fees are paid. If, for example, the inmate had $10.02 in his account, the prison may start deducting fees since he has a balance over $10. *See* 28 U.S.C. § 1915(b)(2). Under a "per case" regime, the inmate would have $8.02 left in his account if he had filed one suit, $6.02 left in his account if he had filed two suits, and $0.02 left in his account if he had filed five suits. *But see supra* note 2. This result is problematic because it is not only contrary to the clear legislative intent of the PLRA, but it also raises an access to courts issue of constitutional dimensions.

3.

We conclude that the admittedly meager legislative history of the PLRA points to the Second Circuit's approach, that a

"per inmate" interpretation is the correct interpretation and both satisfies Congress' intent when passing the PLRA and protects the constitutional rights of inmates.

Congress put a limit on garnishment from an inmate's (already meager) income, understanding that a "chilling effect" on litigation was not the same as a complete bar on filing suits, which may occur if close to one hundred percent of an inmate's income is taken to pay his filing fees. When enacting the PLRA, Congress was explicit that the intention of the statute was to provide prisoners with "an economic downside to going to court." 141 Cong. Rec. S7525 (daily ed. May 25, 1995) (statement of Sen. Dole). Congress sought to provide initial deterrents against suits, but not to *punish* prisoners for electing to litigate. *See* 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) ("The modest monetary outlay [in § 1915] will force prisoners to think twice about the case and not just file reflexively."). The garnishment of more than twenty percent of an indigent inmate's already meager income crosses the line from deterrence to punishment and was not the intent behind § 1915. Specifically, Congress felt that "[t]he filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter . . . multiple filings." 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl).

Furthermore, Congress indicated that the timing of recoupment was not the intended disincentive, but that prisoners would be deterred simply by the requirement that they pay the costs at all. *See* 141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole) (emphasis added) ("[W]hen prisoners know that they will have to pay these costs — *perhaps not at the time of filing, but eventually* — they will be less inclined to file a lawsuit in the first place") (emphasis added).

Congress never intended § 1915(b)(2) to be construed punitively, and in a manner amounting to a denial of a prisoner's

access to courts. *See* 142 Cong. Rec. 5,118 (1996) (statement of Sen. Reid) ("If somebody has a good case, a prisoner, let him file it."); 141 Cong. Rec. 27,042 (1995) (statement of Sen. Hatch) ("I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised."). Under the Seventh Circuit's approach, an inmate could file three lawsuits in district court, all of which present colorable and plausible, but ultimately losing, claims. If the district court grants summary judgment against the inmate in each case, the inmate would be foreclosed from pursuing what could be a meritorious appeal in the third case because the three district court filing fees (60%) coupled with the filing fees for the appeals in the first two cases (40%) would exhaust his trust fund account and he could not pay the appellate filing fee, and therefore could not appeal, the adverse summary judgment in the third case. Congress could not possibly have intended this outcome; certainly, federal courts should not provide this answer to a question that Congress never thought about. *Cf. Benjamin v. Jacobson*, 935 F. Supp. 332, 340 (S.D.N.Y. 1996) ("[I]t is worth noting that some believe that this legislation which has a far-reaching effect on prison conditions and prisoners' rights deserved to have been the subject of significant debate. It was not."); 142 Cong. Rec. 5, 193 (1996) (statement of Sen. Kennedy) ("The PLRA was the subject of a single hearing in the Judiciary Committee, hardly the type of thorough review that a measure of this scope deserves."). Our "per inmate" interpretation today holds true to that intent.

4.

Finally, adopting a "per case" regime for § 1915(b)(2) could present a constitutional problem of access to courts for prisoners. Even if it is true that prisoners often file unmeritorious suits and § 1915(b) is intended to provide a "chilling effect," prisoners under a "per case" regime may be completely barred from filing meritorious claims.[11] Because pris-

---

[11] Although it is true that the number of suits brought by prisoners has increased, there is no indication that the increase has significantly out-

oners who have had "three strikes" under § 1915(g) must pay *the entire filing fee* up front at the time the suit is filed, the simultaneous withdrawal of filing fees from previous suits could hinder a prisoner from asking the courts to address serious abuses that may not necessarily result in serious bodily injury or death.[12] *See* 28 U.S.C. § 1915(g) (creating an exception to the "three strikes" rule for a prisoner who "is under imminent danger of serious physical injury"). Adoption of a "per case" rule would pose genuine risks of constitutional violations and abuses that do not rise to the level of imminent serious physical injury, would never come to the court's attention because prisoners would hesitate to file complaints; it would place additional burdens on the prisoner's finances. In essence, a "per case" interpretation of § 1915(b) would force prisoners to choose between saving their meager income and searching for a remedy for abuses in prison. *Cf. Beville v. Ednie*, 74 F.3d 210, 212 (10th Cir. 1996) ("A prison inmate's right of access to the courts is the most fundamental right he

---

paced the increase in the number of people incarcerated in this country nor have the reasons for the increase in claims been established . . . . A list of reasons for any increase in the number of complaints over a simple increase in the number of prisoners would likely include the high incidence of prison overcrowding, a lack of carefully trained correctional officers, and inadequate and frequently unfair internal grievance procedures.

*Lyon v. Krol*, 127 F.3d 763, 766 & n. 6 (8th Cir. 1997) (Heaney, J., dissenting).

[12]There have been many instances where courts have found abuses in prisons that were constitutional violations that may not have resulted in imminent danger of serious physical injury or death. *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (holding that handcuffing a prisoner to a hitching post for seven hours without regular water and bathroom breaks was unconstitutional); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (finding that exposing prisoners to tobacco smoke that posed an unreasonable risk of serious damage to future health could be considered a constitutional violation); *Smith v. Ozmint*, 578 F.3d 246, 253-54 (4th Cir. 2009) (finding that a prison policy that forces inmates to cut or shave their hair is a violation of genuinely held religious beliefs).

or she holds." (quoting *DeMallory v. Cullen*, 855 F.2d 442, 446 (7th Cir. 1988))).

## III.

Our good colleague dissents on three grounds. First, the dissent contends that we have misinterpreted the applicable provisions of the PLRA. Second, the dissent contends that the case is moot and that we lack "subject matter jurisdiction." Finally, the dissent asserts this court lacks the power to order a refund of filing fees. We address these contentions in turn.

## A.

The dissent's boldly-stated and confident application of its version of "plain meaning" statutory analysis is as unpersuasive as it is formalistic, consisting of little more than reproducing the statute. The approach bespeaks the kind of mechanical statutory interpretation that can lead a court to stray from the full achievement of congressional goals. *See, e.g., Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (*rev'g* 70 F.3d 325, 330 (4th Cir. 1995) (holding that "plain meaning" of statutory term "employee" absolutely excludes from its compass a "former employee")); *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005) (*rev'g* 367 F.3d 245, 251 (4th Cir. 2004) (concluding that one statutory subsection "plainly applie[d]" to another subsection)); *United States v. Hayes*, 129 S.Ct. 1079 (2009) (*rev'g* 482 F.3d 749, 752 (4th Cir. 2007) (determining what statutory provision "plainly require[d]")). By deeming § 1915(b)(2) "simply" to "latch on" to § 1915(b)(1), Dissenting Op. at 34, the dissent begs the question presented: whether a scheme of pyramiding exactions under § 1915(b)(2), such that virtually the entirety of a prisoner's income may be garnished to pay court filing fees, comports with Congress' intent when it undertook a limited and measured approach in deciding to inflict an economic "sting" on inmates who seek redress in federal district court. In deciding the issue at hand as if the

question presented has not been presented, the dissent reaches a conclusion unsupported by genuine analysis. *Cf. Holloway*, 526 U.S. at 7 ("As we have repeatedly stated, 'the meaning of statutory language, plain or not, depends on context.'") (citations and internal quotation omitted).

The dissent categorizes the payments mandated by § b(1) and § b(2) as "two types of installment payments" that must be collected and paid *simultaneously in every case*; but in fact, they are materially distinct in purpose and effect.[13] Indeed, the record here discloses a telling fallacy in the dissent's unwarranted assumptions. Although corrections officials *sua sponte* withheld 40% of Torres's income for the payment of fees in the two appeals before us, *the district court applied all the funds it received only to the first case*. Thus, the actual implementation of the statute in this instance resulted in a deviation from the clear congressional mandate the dissent asserts is unavoidable in a "plain meaning" reading of the statute: that no more than 20% of an inmate's income be withheld *per case*. In fact, Torres (now released from custody) has paid 40% of his monthly income in "a [single] case."

It is also worth noting that, in keeping with the sensible practice of many district courts around the country, the district court in these cases promptly determined that the complaints failed to state a claim upon which relief could be granted and dismissed each case pursuant to 28 U.S.C. § 1915A *without bothering to process Torres's request for in forma pauperis*

---

[13] In fashioning its extra-statutory term "installment payments," the dissent commits the very infraction of which we are said to be guilty: that by construing the monthly payment provision as we do, we are inappropriately inserting a word ("cap") into the statute. *See* Dissenting Op. at 27-28 (citing *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004)). But this is not accurate. The circumstances arising from statutory silence we find present here are "familiar," and simply require that we construe a statute "where Congress has enacted a law that does not answer 'the precise question at issue.'" *Lopez v. Davis,* 531 U.S. 230, 242 (2001).

*status.*[14] Accordingly, Torres quickly earned "two strikes" under the "three-strike" "door-closing" trigger of 28 U.S.C. § 1915(g), which is Congress' preferred method for barring access to federal district court to mischievous inmates intent on engaging in "recreational litigation." In any event, contrary to the dissent's preferred approach, there is absolutely nothing inherent in Congress' decision to require, in § b(1), an exaction of 20% of the inmate's "average monthly balance" in his trust account (or "average monthly deposits") as a "partial payment" of a filing fee at the commencement of each case or appeal, which compels the conclusion that the subsequent "monthly payments," required by § b(2) to be calculated as 20% of his previous month's income, must be withheld without regard to the number of cases and appeals pending at the same time.[15]

The dissent scolds us because we forthrightly acknowledge (in agreement with Judge Easterbrook, *see Newlin*, 123 F.3d at 436, but in disagreement with the per curiam decision of the Fifth Circuit, *see Atchison*, 288 F.3d at 180) that the

---

[14] *See* Julia Colaruso, Comment, *Out of Jail But Still not Free to Litigate? Using Congressional Intent to Interpret 28 U.S.C. § 1915(B)'s Application to Released Prisoners*, 58 Am. U. L. Rev. 1533, 1544 n. 61 (2009) (citations omitted):

> [S]ome courts review the petitioner's IFP application while simultaneously deciding the merits of his claim . . . . Under this approach, the court automatically denies IFP status upon a finding that the claim is frivolous or malicious and thereby dismisses the case . . . . Courts utilize the one-step procedure in part because it "helps minimize the drain on public funds and judicial resources that in forma pauperis litigants might otherwise cause."

[15] Even if we grant the existence of a few of the dissent's hypothetical inmates who, like the Fifth Circuit's hypothetical Texas inmate, are "free to file a § 1983 action against the President in the District of Columbia," *see Atchison*, 288 F.3d at 181, and who thus file cases in different federal district courts, such speculation provides scant reason to apply the statute as the dissent would. As we observe, *supra* p. 8, corrections officials are suitably equipped to handle such outliers by remitting withheld inmate funds to the appropriate courts *sequentially*.

PLRA is in a material respect "silent," requiring us to fathom (unexpressed) congressional intent regarding the sequencing (or not) of the monthly payments assessed pursuant to § b(2). Statutory silence may, *see Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 869 (D.C. Cir. 1996) ("In view of its silence on the point at issue, we must hold the statute ambiguous."), or may not, *see Univ. of Chi. Hosps. v. United States*, 545 F.3d 564, 567 (7th Cir. 2008) ("[T]he statute's silence on the specific subject of medical residents does not necessarily mean it is ambiguous."), give rise to latent statutory ambiguity. At all events, the Supreme Court does not share the dissent's timidity in this regard. *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487 (2005) ("[T]he statute is silent on who is a 'seaman.'"); *Christensen v. Harris County*, 529 U.S. 576, 585 (2000)("Because the statute is silent on this issue and because the county's policy is entirely compatible with § 207(o)(5), petitioners cannot, as § 216(b) requires, prove that the county has violated § 207."); *Demore v. Kim*, 538 U.S. 510, 578 (2003) (Breyer, J. dissenting) ("I would interpret the (silent) statute as imposing these bail standards."); *Holloway*, 526 U.S. at 22 (Thomas, J., dissenting) ("The central difficulty in this case is that the text is silent as to the meaning of 'intent.'").

Indeed, members of the Supreme Court have noted that at least one provision of the PLRA itself is "silent" in a material respect. *See Miller v. French*, 530 U.S. 327, 358-59 (2000) ("There is no logical inconsistency in saying both (1) a motion (to terminate) "shall operate as a stay," and (2) the court retains the power to modify or delay the operation of the stay in appropriate circumstances. The statutory language says nothing about this last-mentioned power. *It is silent.* It does not direct the district court to leave the stay in place come what may.") (Breyer, J., dissenting) (emphasis added). Similarly here, "[t]here is no logical inconsistency in saying both" (1) § b(1) requires a partial payment for every case or appeal that is filed, and (2) the potentially harsh effects of pyramiding the monthly exactions mandated by § b(2) (not to mention

the potentially unconstitutional effects) may be — and should be — ameliorated by ordering that they be paid sequentially rather than simultaneously where more than one case or appeal is pending.[16]

We respect, but take a different view from, the dissent's credulous observation that governmental appropriation of virtually the entirety of an inmate's monthly income for the payment of court filing fees does not rise to the level of "punishment." Congressional and judicial disapprobation of frivolous claims instituted by too-idle prisoners is entirely appropriate; we honor Congress' goal to reduce the incidence of frivolous claims by our holding.[17] On the other hand, only a little more than a fortnight ago, the Supreme Court reminded us that there are limits to official hostility to prisoner litigation. *Wilkins v. Gaddy*, 130 S.Ct. 1175 (2010) (per curiam) (abrogating Fourth Circuit rule that allegation of only de minimus injury precludes Eighth Amendment excessive force claim). As mentioned above, we believe that Congress intended to inflict an economic "sting" on inmates as a disincentive to the filing of meritless claims, not to impose a regime in which an inmate has access to federal district court only at such an oppressive cost as the dissent is willing, if not anxious, to impose.

---

[16]The dissent's reliance on *Roller v. Gunn*, 107 F.3d 227, 231-33 (4th Cir. 1997), is misplaced. Unlike the appellant in that case, Torres does not contend that the *imposition* of filing fees on inmates violates the constitution. Rather, he contends, as the Second Circuit has found, that the *pyramiding* of the monthly payments required by § b(2) poses an *avoidable* risk that a constitutionally-cognizable impediment to an inmate's access to courts could result. *Roller* did not purport to address this issue.

[17]Notably, in enacting the PLRA to address the increase in litigation arising in the prison setting, Congress imposed not only (1) filing fees and (2) the "three-strikes" rule already discussed, but it also (3) "invigorated the exhaustion prescription" required of prisoners bringing claims under 42 U.S.C. § 1983, by imposing a *mandatory exhaustion* requirement that "differs markedly" from its predecessor. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Clearly, Congress knows how to address the problem of frivolous prisoner litigation.

## B.

The dissent also contends that because Torres has been released from prison, *see supra* n. 1, the PLRA no longer applies to him and therefore, the case is moot. It is said that we are merely issuing an advisory opinion. In their joint post-argument submission to the court, counsel for the parties disagree with the dissent, as do we.

The merits of these appeals have long been decided and there is no unadjudicated "claim" against the named defendants here. The question now before us is whether Torres should get a partial refund of the filing fees paid on his behalf from his prison trust account, not simply whether Torres should only have 20% deducted from his prison account at all times. We ultimately conclude (consistent with Judicial Conference Policy) that he is not entitled to a refund of fees under the circumstances. *See infra* pages 24-25. Contrary to the assertions in the dissent, however, federal courts plainly and unmistakably have the power to refund a litigant's payment of an excessive or mistaken filing fee to a litigant, including, in particular, indigent prisoners. *See West v. Blair*, No. 00-20615, 2001 WL 563818 at *5 (5th Cir. May 15, 2001) (unpublished) (per curiam) ("The district court was within its authority to order that the excess fees . . . be returned to the proper prison accounts. . . . [O]ur court has found that denying indigent litigants a refund of filing fees may violate their right of access to the courts.") (citing *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994)).

Relatedly, the dissent suggests that because we have decided to deny a refund of the excessive filing fees paid on behalf of Torres, it follows that any discussion of the harm itself is merely gratuitous. Surely, this is not true. Our constitutional tradition traces at least to *Marbury v. Madison*, 5 U.S. 137 (1803), the notion that a court should determine, first, whether there was a legal harm before it undertakes consideration of a remedy. We conclude that the decision whether to

refund fees requires of this court an exercise of discretion, but we could no sooner exercise our discretion not to order a refund of fees without first deciding whether there was an "overpayment" in the first instance.

## C.

The dissent also claims that, based on sovereign immunity, we have no discretion to fashion a remedy and thus we lack power even to consider whether a legal injury occurred. The dissent is clearly mistaken. First, as we have discussed, federal courts have the authority to refund an overpayment of filing fees, and in fact, have ordered the refund of excessive filing fees. *See West*, 2001 WL 563818 at \*5. Second, sovereign immunity bars claims against the United States for *money damages*, but has never been interpreted to bar a *request* to a governmental agency or department simply to recover property or the fair-value of that property erroneously delivered to the government. The difference between the analysis we would conduct in the sovereign immunity context and the discretion afforded us by the policies of the Judicial Conference of the United States to refund excessive filing fees necessitates an analysis of whether the fees were wrongly collected. Manifestly, the refund request in this case illustrates the difference between an analysis of a *claim* that would not be redressable in the sovereign immunity context, and a *request* that we clearly may remedy at our discretion. In short, this case does not call into question our Article III powers to adjudicate the merits of Torres's motion for a partial refund of filing fees.

## IV.

We hold that 28 U.S.C. § 1915(b)(2) caps the amount of funds that may be withdrawn from an inmate's trust account at a maximum of twenty percent *regardless of the number of cases or appeals the inmate has filed*. Accordingly, the Warden of Red Onion State Prison shall collect and remit to the

clerk of the United States District Court for the Western District of Virginia, and the clerk shall accept, no more than twenty percent of an inmate's preceding monthly income or trust account balance, as the case may be, as payment toward his filing fees obligation.

Torres has now been released from custody and during his imprisonment, he fully complied (indeed, under our holding, more than fully complied) with his PLRA payment obligations for these appeals. Accordingly, under our precedent, he is absolved from further payments. *See DeBlasio*, 315 F. 3d at 397. Nevertheless, under the circumstances, although federal courts have the authority to order a refund of excessive filing fees, we decline to grant a partial refund of fees to Torres. The amounts withheld from his trust account and remitted on his behalf during his incarceration were actually owed and properly (if excessively) collected. *Cf. West*, 2001 WL 563818 at *5 (approving district court order granting refund where two prisoners, as joint plaintiffs, overpaid filing fees for a single case filed in district court). Were he still incarcerated, Torres would have been entitled, at the least, to a temporary abatement in the collection of fees from his prison account. We conclude, however, that there is no unfairness, under the circumstances, in declining to order the district court clerk to effect a refund.

* * * *

For the reasons set forth, the motion for partial refund of fees is

*DENIED.*

NIEMEYER, Circuit Judge, dissenting:

Torres, having proceeded *in forma pauperis* in two separate actions that he filed, now owes fees for those actions. Section 1915(b) provides that a prisoner filing an action or appeal *in*

*forma pauperis* must pay "the full amount of a filing fee." 28 U.S.C. § 1915(b)(1). Recognizing, however, the financial status of prisoners proceeding *in forma pauperis*, the section does not require the prisoner to pay the full amount of this fee up front. Rather, it authorizes him to pay an initial partial payment of the fee consisting of 20% of the greater of the average monthly deposits made to his prison account or the average monthly balance in the account, *id.*, and the remainder in monthly installments of 20% of the preceding month's income, *id.* § 1915(b)(2).

In a remarkably proactive approach to statutory interpretation, the majority holds that, even though § 1915(b)(1) requires the prisoner to make an initial partial payment on the filing fee for *each action or appeal filed*, § 1915(b)(2) somehow applies only to the first action or appeal filed, until the fee for that action is paid in full, and then sequentially to each other action or appeal filed, until all are paid. Stated otherwise, the majority reads § 1915(b)(2) to "*cap*[ ] the amount of funds that may be withdrawn from an inmate's trust account at a maximum of twenty percent *regardless of the number of cases or appeals the inmate has filed*." *Ante* at 24 (emphasis in original). It does this even as it recognizes that the statute contains no language to impose the "cap"; indeed, according to the majority, the statute "is simply *silent*." *Ante* at 10 (emphasis in original).

Reacting to statutory "silence," the majority answers a "call" "to determine what Congress *would have done* had it thought about the problem." *Ante* at 12 (emphasis added). To do this, it focuses on selective statements of Senators in the legislative history about what the bill would accomplish, concluding that "Congress sought to provide initial deterrents against [prisoners'] suits, but not to *punish* prisoners for electing to litigate." *Ante* at 15 (emphasis in original). From that intuitive conclusion, which, in fact, is unsupported by the legislative history, it reasons that "[t]he garnishment of more than twenty percent of an indigent inmate's already meager

income crosses the line from deterrence to punishment and was not the intent behind § 1915." *Ante* at 15 (citing Senator Kyl's inapposite statement, "The filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter . . . multiple filings," to support this conclusion). And the majority reaches this conclusion even though it fails to explain how requiring a litigant to pay preestablished filing fees is punishment.

The majority crowns its analysis with the conclusion that its cap on filing fees is necessary because requiring the prisoner to make the required monthly payment *for each action or appeal filed* "could present a constitutional problem of access to courts for prisoners." *Ante* at 16. Indeed, it refers to the reading of the statute that requires a prisoner to pay the full filing fee in each case that he chooses to file as a "pyramiding" scheme. *See ante* at 18, 21. Without the citation of authority, the majority concludes that the requirement that payment be made for each action or appeal filed would mean that "prisoners under a [fee] 'per case' regime may be *completely barred* from filing meritorious claims," *ante* at 16 (emphasis added), and that the bar created from the prisoner's financial burden would violate the Constitution, despite our court's earlier conclusion to the contrary. *See Roller v. Gunn*, 107 F.3d 227, 231-33 (4th Cir. 1997) (noting that a prisoner simply has to make a financial choice, as does everyone else, of how to spend his money).

While there may be a textual analysis of § 1915(b)(2) that could give some support to the majority's holding, it is not obvious, and the majority does not undertake it. To the contrary, the majority simply speculates about "what Congress would have done had it thought about the problem." *Ante* at 12. This form of statutory interpretation is fundamentally unsupportable. *See Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004) (condemning a court's insertion of an absent word into statute as an inappropriate "'enlargement of it by the court'" (quoting *Iselin v. United States*, 270 U.S. 245, 251

(1926) (noting that supplying inadvertent omissions to a statute "transcends the judicial function"))). And, of course, implementing an interpretation without textual support has never before been recognized in our precedents. *See, e.g.*, *United States v. Passaro*, 577 F.3d 207, 213 (4th Cir. 2009) ("When interpreting any statute, we must first and foremost strive to implement congressional intent by examining the plain language of the statute"); *Chesapeake Ranch Water Co. v. Bd. of Comm'rs of Calvert County*, 401 F.3d 274, 279 (4th Cir. 2005) ("As in all cases of statutory interpretation, our inquiry begins with the text of the statute"); *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004) ("When interpreting statutes we start with the plain language"); *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993) ("The proper interpretation of [a statute] must begin with the plain language of the statute, and absent ambiguity or a clearly expressed legislative intent to the contrary, the statute must be given its plain meaning"); *see also Boumediene v. Bush*, 128 S. Ct. 2229, 2271 (2008) ("The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. We cannot ignore the text and purpose of a statute in order to save it").

Aside from the merits of the dispute, I also submit that this case became moot when Torres was released from prison, and therefore it should be dismissed. Because of this and because the interpretation of § 1915(b)(2) most faithful to its *text* mandates that a prisoner make the 20% monthly payment toward the filing fees *for each action or appeal* he has filed, I respectfully dissent.

I

The issue in this case arises from a letter sent by Torres to the Clerk of the district court and forwarded to the Clerk of our court, complaining that prison officials were withholding 40% of his monthly prison income to pay the fees for two

cases that he had filed against prison officials complaining about prison conditions.

In the first case, Torres sued prison officials, claiming that their failure to repair a flickering night light in his cell violated his Eighth Amendment rights. The district court dismissed the suit under 28 U.S.C. § 1915A(b)(1), and we affirmed. We also directed Torres to pay the fees for the action in accordance with 28 U.S.C. § 1915(b). Following our order, Torres paid the initial partial fee, and prison officials began collecting 20% of Torres' monthly income to pay the remainder. In the second case, Torres again sued prison officials, this time alleging that they had violated his First and Fourteenth Amendment rights by denying his request to order pictures of nude women from a commercial, online publisher. The district court dismissed the action, and we affirmed. We again directed prison officials to collect fees in accordance with § 1915(b). At the time we issued the second order, prison officials were still withdrawing 20% of Torres' income to pay the filing fees for the first lawsuit. To accommodate our order, prison officials then began drawing an additional 20% for the second lawsuit, for a total of 40%.*

When Torres noticed that 40% of his prison account income was being withheld to pay filing fees, he sent a letter to the Clerk of the district court asking why 40% was being withheld and requesting that he be "stopped being charged 40%" to pay his filing fees. The Clerk of the district court forwarded the letter to the Clerk of this court, where the Clerk docketed the letter as a motion for refund of fees, which is now before us. The question presented, accordingly, is

---

*Upon receiving funds from Torres' prison account, the district court erroneously applied the full 40% withheld to the filing-fee debt from Torres' first suit. Consistent with § 1915(b)(2)'s direction, however, that a prisoner make monthly payments on the filing-fee debts for each action or appeal filed, the district court should have applied 20% of Torres' monthly income to the filing-fee debts on each of his two cases.

whether the terms of the Prison Litigation Reform Act ("PLRA")—particularly § 1915(b)(2)—apply to *each action or appeal* that a prisoner files or whether, instead, they somehow impose a "cap" on total monthly filing-fee payments, regardless of how many cases a prisoner has filed.

The PLRA was enacted in 1996 in response to Congress' conclusion that prisoners were flooding the courts with mostly frivolous litigation. *See Roller*, 107 F.3d at 230-31. "Finding that the proliferation of prison litigation was due significantly to the lack of economic disincentives to filing meritless cases," the Act imposed the requirement that inmates pay the full amount of filing fees. *See id.* Because of the prisoners' lack of financial resources, however, the PLRA authorized prisoners to pay the fees in installments, as specified in the Act.

Under the PLRA, prisoners are required to make two types of installment payments on their filing-fee debts. Subsection (b)(1) of § 1915 sets up the first of these payments, which is an "initial partial filing fee," required to be paid by the prisoner at the time he files the suit, equal to 20% of the greater of his average monthly income or his average monthly prison account balance. *See* 28 U.S.C. § 1915(b)(1). Once the prisoner has made this initial partial payment, subsection (b)(2) then requires him to continue paying monthly installments, each equal to 20% of his monthly income, until the debt is paid. *See id.* § 1915(b)(2). This case requires us to determine whether the installment payments established by subsection (b)(2) must be made for *each action or appeal* that a prisoner files or whether it must be made on only the *first* action filed until the fee debt in that action is fully paid and then on the second action.

The majority concludes that the PLRA imposes a sequential payment plan by which a prisoner pays installments for his first case through deductions of 20% of his monthly income and starts to pay installments for a second case only when the

fees for the first case are paid in full. It thus holds that the 20% withholding requirement provided in the Act is a "cap," regardless of the number of cases filed by the prisoner. This holding gives prisoners, in effect, a free ride after they file their first piece of litigation.

Fairly read, however, § 1915 does not even hint at the "cap" and sequential payment plan suggested by the majority. Read as a whole, the language and operation of § 1915 persuasively point to the conclusion that its terms apply *to each action or appeal* filed by a prisoner and that they do not make a special accommodation when the prisoner files multiple actions or appeals. If § 1915 as a whole applies to each action or appeal the prisoner files, then *a fortiori* § 1915(b)(2), providing for the payment of fees in installments, also applies to each action or appeal filed. Looking at the entirety of § 1915, there can be little doubt that there is no Presidents' Day sale for multiple actions, providing that if the prisoner begins paying for the first, he can file the second at a discount.

Subsection (a) of § 1915 begins by providing, "*Subject to subsection (b)*, any court of the United States may authorize the commencement, prosecution or defense of *any suit, action or proceeding* . . . without prepayment of fees." *Id.* § 1915(a) (emphasis added). Subsection (b) then connects to subsection (a) by providing, "*Notwithstanding subsection (a)*, if a prisoner brings *a civil action* or files an appeal in forma pauperis, *the prisoner shall be required to pay* the full amount of a filing fee." *Id.* § 1915(b)(1) (emphasis added). Both subsection (a) and subsection (b) address the fees incurred *in any civil action* filed by a prisoner. Subsection (b)(1) continues by providing that *in the civil action* filed by the prisoner, the prisoner must make a down payment of the filing fees for which he will become obligated to pay, consisting of 20% of the greater of his average monthly income or average account balance for the preceding six months. *See id.* § 1915(b)(1). As Torres correctly notes, a prisoner must pay this initial partial filing fee *each time he files an action* or an appeal. *See id.*

§ 1915(b)(1); Reply Br. at 6 ("Except in rare circumstances that do not apply here, the law absolutely requires an inmate to make this initial payment *every time* and *at the time* he/she commences a legal action" (emphasis in original)).

Addressing that same action or appeal for which the prisoner must make a down payment, subsection (b)(2) requires that the prisoner pay the *remainder* of the fees in installments consisting of 20% of his monthly income until the full fee is paid. *See* 28 U.S.C. § 1915(b)(2). The fact that subsection (b)(2) refers to the same action or appeal addressed in subsection (b)(1) is made clear by the introductory clause of subsection (b)(2): "*After payment of the initial partial filing fee* [required by (b)(1)] . . . ." Thus, the initial down payment provided for in subsection (b)(1) is the triggering condition for the installments provided for in subsection (b)(2), and both provisions apply to the same civil action or appeal filed. Indeed, subsection (b)(2) can be referring to nothing other than the action referred to in subsection (b)(1), which requires the down payment—"the initial partial filing fee." Thus, if, as Torres concedes, a prisoner must make the down payment on the filing fees *in every action or appeal filed*, it follows that the prisoner must also make the installment payments on the remainder of those filing fees in every action or appeal filed, in accordance with subsection (b)(2). Subsection (b)(2) makes no exception for multiple filings.

It makes no textual sense to conclude that subsection (b)(1) imposes a down payment ("initial partial filing fee") in each action that a prisoner files and then somehow conclude *from the text* that subsection (b)(2), providing for the payment of *the remainder* of the filing fees, applies only to the first action that the prisoner files, and not to any subsequent action that the prisoner files, *until* the fees in the first action are paid in full. Nothing—not even logic—supports such an interpretation. Yet, that is precisely what the majority holds is appropriate.

As an additional indicator that subsection (b)(2) applies to each action filed, subsection (b)(2) directs prison officials to forward the installments "to the clerk of the court," obviously referring to the Clerk of the court where *the action or the appeal was filed*. *See Atchinson v. Collins*, 288 F.3d 177, 181 (5th Cir. 2002). Thus, if the prisoner files his first action in the Eastern District of Virginia, he makes the down payment and forwards it to the Clerk of the district court in the Eastern District of Virginia, as well as the installment payments for the remainder. If the prisoner files his second action in the District of Maryland, he must again make the down payment, but this time to the Clerk of the district court in the District of Maryland, and likewise he must forward the remainder of the filing fee in installments to that Clerk.

Finally, it is clear from the rest of § 1915 that its terms are meant to govern each action or appeal filed under the authorization of subsection (a)(1). Specifically, subsection (e) provides, "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss *the case* at any time if the court determines that" the allegation of poverty is untrue or the case is defective in some way. 28 U.S.C. § 1915(e)(2). Likewise, subsection (f) authorizes the court to render judgment for costs "at the conclusion of *the suit or action* as in other proceedings." *Id.* § 1915(f)(1). Reading each subsection of § 1915, it is clear that the focus of that statute is on each individual action or appeal filed under its authorization and that it makes no attempt to govern any aspect of actions other than the one before the court. *See also id.* § 1915(c) (authorizing the court to direct the United States to pay the expenses of preparing transcripts and appellate records if required by the case); *id.* § 1915(d) (providing for the same remedies and process in a case filed under § 1915 as are available in other cases); *id.* § 1915(g) (prohibiting a prisoner from bringing a new action or appeal under § 1915 if he has previously had three suits dismissed for being frivolous, malicious, or for failing to state a claim). To interpret subsection (b)(2) as imposing a global cap on filing fees incurred in

cases other than the one presently before the court would divorce that subsection from the rest of § 1915—a result unsupportable by the text of the statute.

Despite these indications from the statute's text, Torres argues—and the majority accepts—that the word "any" in subsection (b)(1) somehow imposes a limit on the fees that can be collected under subsection (b)(2). But this analysis simply does not work. Even if "any" means "any and all," as the majority concludes, subsection (b)(1) then provides simply that a prisoner must pay an initial partial payment of "any and all" court fees required *in the civil action*. Subsection (b)(2) then simply latches on to subsection (b)(1) by providing for the way in which the prisoner pays *the remainder* of the fees referred to in subsection (b)(1). There is nothing in either of those subsections to indicate that if the prisoner is already in the process of paying a filing fee for a different, earlier-filed action or appeal, he is spared the requirement of paying the installments for the current action.

Both Torres and the majority also argue, without identifying textual support for their interpretation, that statements in the legislative history suggest that Senators were sensitive to charging excessive costs and that those statements somehow support imposing a limit or cap on the statute's requirement that the prisoner pay filing fees in each action or appeal he files. A more complete reading of the references cited from the legislative history, however, suggests that the Senators did not speak of an accumulative cap on fees, but rather intended that prisoners make a choice each time they file a lawsuit about whether the "lawsuit [is] worth the price." *See* 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl).

Finally, both Torres and the majority argue that if the court were to interpret the statute as requiring the prisoner to pay the monthly installments on the filing fees in each case or appeal filed, serious constitutional problems could arise when

the prisoner files multiple actions because the required payments would impose a financial burden that denies the prisoner access to the courts. This argument, however, is advanced without legal support. Indeed, we have held to the contrary, as explained in *Roller*:

> Requiring prisoners to make economic decisions about filing lawsuits does not deny access to the courts; it merely places the indigent prisoner in a position similar to that faced by those whose basic costs of living are not paid by the state. Those living outside of prisons cannot file a lawsuit every time they suffer a real or imagined slight. Instead, they must weigh the importance of redress before resorting to the legal system. If a prisoner determines that his funds are better spent on other items rather than filing a civil rights suit, 'he has demonstrated an implied evaluation of that suit' that the courts should be entitled to honor.

107 F.3d at 233; *see also Atchison*, 288 F.3d at 181.

Moreover, the statute expressly guards against any access problem in § 1915(b)(4), which provides that "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." *See also* 28 U.S.C. § 1915(b)(1) ("The court shall assess and, *when funds exist*, collect . . . ." (emphasis added)). Plainly, even in the situation where the filing of five lawsuits has caused a prisoner's entire monthly income to be devoted to filing fees, § 1915(b)(4) preserves his ability to challenge the conditions of his confinement in court, assuming, of course, he has not run afoul of the other provisions of § 1915 meant to prevent frivolous and repetitive lawsuits. *See, e.g.*, *id.* § 1915(g). Thus, even in the majority's unlikely hypothetical, no constitutional question will arise.

In conclusion, a straightforward reading of § 1915 indicates that a prisoner must pay the full fees in each action or appeal that he files and that his payment of those fees is discharged by a down payment, as provided for in subsection (b)(1), and by installments for the remainder, as provided in subsection (b)(2). Nothing can be gleaned from the statute to suggest that these requirements are administered differently in the second action or, indeed, the third action filed by the prisoner. In embracing this natural reading, I join the majority of the circuits—indeed, all of the circuits except for the Second Circuit—that have addressed this issue. *See Atchison v. Collins*, 288 F.3d 177 (5th Cir. 2002); *Lefkowitz v. Citi-Equity Group*, 146 F.3d 609, 612 (8th Cir. 1998); *Newlin v. Helman*, 123 F.3d 429, 436 (7th Cir. 1997); *cf. McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997).

Accordingly, I would affirm the collection of the filing fees from Torres for each action filed, as has been done, and deny his motion for a refund.

## II

Quite apart from the merits, as a matter of subject matter jurisdiction, which was not briefed by the parties but which arises by reason of the fact that Torres has now been released from custody, I respectfully suggest that this case is moot and that, accordingly, we must dismiss it.

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)); *see also Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792). Rather,

"[t]o be cognizable in federal court, a suit . . . 'must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Rice*, 404 U.S. at 246 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

In order to ensure that federal courts do not issue unconstitutional advisory opinions, the Supreme Court has established several justiciability doctrines that must be satisfied to confer jurisdiction on a federal court, including the doctrines of standing and mootness. Along with injury and causation, the "irreduceable constitutional minimum of standing" requires a party seeking relief in federal court to establish that the injury complained of is "redress[able] by a favorable decision." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, if relief from the injury is not "'likely' to follow from a favorable decision," the party seeking relief has no standing and has not presented a justiciable case or controversy. *See Allen v. Wright*, 468 U.S. 737, 751 (1984). Likewise, because "[m]oot questions require no answer," *Mo., Kan. & Tex. Ry. v. Ferris*, 179 U.S. 602, 606 (1900), federal courts "[are] not empowered to decide moot questions or abstract propositions," *California v. San Pablo & Tulare R.R.*, 149 U.S. 308, 314 (1893).

The relief that Torres sought in this case was to "stop" withholding 40% of his prison account income to pay his filing-fee indebtedness. But because of Torres' release from prison, prison officials will no longer be collecting payments on Torres' filing-fee debts. *See DeBlasio v. Gilmore*, 315 F.3d 396, 397 (4th Cir. 2003). Accordingly, there is no continuing conduct to enjoin. Moreover, it is clear from Supreme Court precedent that the possibility Torres may one day be required to resume making payments under § 1915(b)(2) on his filing fees should he reenter the prison system is far too speculative to justify finding a justiciable claim for injunctive relief. *See Lyons*, 461 U.S. at 105-08 (holding that Lyons did not have

standing to seek an injunction prohibiting the Los Angeles Police Department from employing chokeholds because he could not establish that he would be subjected to a chokehold in the future); *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (holding that no case or controversy existed to enjoin local magistrates from discriminating in the enforcement of criminal laws because it was to be assumed that "[plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners"). Indeed, it is debatable whether, in this circuit, Torres will ever have to resume making payments under § 1915(b)(2) even were he to reenter the prison system. *See DeBlasio*, 315 F.3d at 397 ("We hold that the PLRA fee requirements are not applicable to a released prisoner (assuming the prisoner made any required payments while in prison) and that his obligation to pay filing fees is determined by evaluating whether he qualifies under the general in forma pauperis provision of 28 U.S.C. § 1915(a)(1)").

The majority rests its jurisdiction on a phantom claim for a refund for "overpayment" of filing fees. In fact, however, Torres makes no such claim. Torres asked simply why 40% of his prison account income was being withheld and requested that he be "stopped being charged 40%" to pay his filing-fees indebtedness.

Moreover, there is no suggestion that Torres does not owe the full amount of the filing fees charged in the two cases. The applicable statute requires that he pay the full amount of filing fees in each case that he files. *See* 28 U.S.C. § 1915(b)(1). Nor is there any suggestion that the amount collected from Torres was greater than the total amount he owed for filing fees. Accordingly, Torres does not and cannot claim to have overpaid the filing fees. While it is true that he claims that 20%, not 40%, should be withheld to pay a given installment against his filing-fee indebtedness, his payment of 40% in lieu of 20% does not entitle him to a refund.

At bottom, with no continuing conduct to enjoin and an insufficient likelihood that the conduct will resume, Torres' claim that he be "stopped being charged 40%" became moot the moment he was released from prison. Therefore, no justiciable case or controversy now exists.

The majority provides no legal justification for the judicial power it gratuitously exercises over a moot dispute other than to conclude, "We, however, find it appropriate for the guidance of the courts and corrections officials in this circuit, to explain why, while Torres was in custody, withholding of 40% of his monthly income was inconsistent with our orders and, ultimately, with the PLRA." *Ante* at 5 n.1. This desire "to explain," however, provides no basis to render this a justiciable case or controversy under Article III of the Constitution.

The majority opinion is, therefore, nothing more than an unconstitutional advisory opinion on the operation of 28 U.S.C. § 1915(b)(2). Indeed, this is manifested by the very relief it orders. It commands that "the Warden of Red Onion State Prison shall collect and remit to the clerk of the United States District Court for the Western District of Virginia, and the clerk shall accept, no more than twenty percent of an inmate's preceding monthly income or trust account balance, as the case may be, as payment toward his filing fees obligation." *Ante* at 25. Regardless of the "guidance" this directive might provide for future inmates, Torres is the only petitioner in this case. Because he is no longer in the custody of the Red Onion State Prison, this directive has absolutely no effect on him. This is the hallmark of an advisory opinion.

Because any relief requested is beyond the powers of this court, the case must be dismissed.